UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RONALD SCANLAN,

        Plaintiff,

        v.

Case No. 22-cv-586-pp

UNITED HEALTHCARE CORPORATION,

        Involuntary Plaintiff,

        v.

ADAMS MANUFACTURING COMPANY,
ABC INSURANCE COMPANY,
and DEF INSURANCE COMPANY,

        Defendants,

and

UNITED HEALTHCARE CORPORATION,

        Cross-Claimant,

        v.

RONALD SCANLAN,

        Cross-Defendant.

**ORDER GRANTING PLAINTIFF'S MOTION TO EXCLUDE PORTIONS OF DR. JONES'S OPINIONS (DKT. NO. 109), GRANTING PLAINTIFF'S MOTION TO STRIKE MAUREEN SCHNEIDER'S DECLARATION (DKT. NO. 139), DENYING DEFENDANT'S MOTION TO EXCLUDE DR. DUNN'S OPINIONS (DKT. NO. 113), GRANTING DEFENDANT'S MOTION TO EXCLUDE DR. TRIBUS'S OPINIONS (DKT. NO. 114) AND DENYING DEFENDANT'S MOTION TO EXCLUDE JOELLEN GILL'S OPINIONS (DKT. NO. 116)**

Pending are five motions to strike or exclude: (in the order they were filed) (1) the plaintiff's motion to exclude certain opinions of Dr. David Jones, dkt. no. 109; (2) the defendant's motion to exclude the opinions of plaintiff's expert Russell Dunn, dkt. no. 113; (3) the defendant's motion to exclude the opinions of plaintiff's expert Clifford Tribus, dkt. no. 114; (4) the defendant's motion to exclude the report and testimony of plaintiff's expert Joellen Gill, dkt. no. 116; and (5) the plaintiff's motion to strike "sham declaration of Maureen Schenider and/or consider surreply argument," dkt. no. 139. The court calendared a hearing on October 9, 202, hoping to resolve the motions to strike orally. Dkt. No. 141. But given the length and complexity of the briefing on these motions, the court determined that an oral ruling was not feasible. At the hearing (which eventually took place on October 16, 2025), the court advised the parties that this written decision would follow.

## I.  Background

On May 17, 2022, the plaintiff filed the complaint, alleging that he had suffered injuries and damages due to an Adirondack-style chair manufactured by the defendant. Dkt. No. 1. The plaintiff alleged that on October 29, 2021, while he was staying at a vacation home rented from Homestead Suites, Inc., he "placed some, but not all, of his weight on" the chair. Id. at ¶¶7-11. The plaintiff alleged that the chair collapsed, causing him to strike the ground and "suffer[] serious personal injuries resulting in quadriplegia." Id. at ¶11.

This case has been contentious and plagued by discovery disputes. The parties have filed multiple motions to compel (Dkt. Nos. 30, 60, 66, 99), a

2

motion for sanctions (Dkt. No. 58) and a motion for protective order (Dkt. No. 83), all of which have required the court's intervention to resolve. The court previously sanctioned the plaintiff, finding that "[t]he plaintiff's counsel has exhibited a pattern of failing to timely respond, or to respond at all, to the defendant's motions or discovery requests." Dkt. No. 71 at 16. The court resolved several motions at a hearing on February 7, 2025, and at that time reset the parties' deadlines for completing discovery and filing dispositive motions. Dkt. No. 108.

On April 30, 2025, the defendant filed a motion for summary judgment. Dkt. No. 110. With the motion, the defendant filed motions to exclude opinions of three of the plaintiff's expert witnesses: Russell Dunn, Clifford Tribus and Joellen Gill. Dkt. Nos. 113, 114, 116. That same day, the *plaintiff* filed a motion to exclude opinions of the *defendant's* expert witness, Dr. David Jones. Dkt. No. 109. With its reply in support of its motion to exclude Dunn's opinions, the defendant filed a declaration from Maureen Schneider, the defendant's quality assurance manager. Dkt. No. 134. The plaintiff then filed a motion to strike the "sham declaration of Maureen Schneider and/or consider surreply argument." Dkt. No. 139.

## II.    Legal Standard

Rule 702 of the Federal Rules of Evidence and <u>Daubert v. Merrell Dow Pharmaceuticals, Inc.</u>, 509 U.S. 579 (1993) govern the admissibility of expert testimony. Under Rule 702, a witness may be qualified as an expert by knowledge, skill, experience, training or education. Fed. R. Evid. 702. The party

3

seeking to introduce the testimony must establish that it is more likely than not that the testimony (specifically, the proposed expert's knowledge) will assist the trier of fact to understand the evidence or to determine a fact at issue, that the testimony is based on sufficient facts or data, that the testimony is the product of reliable principles and methods and that the expert's opinion reflects a reliable application of the principles and methods to the facts of the case. Id. The court acts as a gatekeeper to ensure that the testimony rests on a reliable foundation and is relevant to the task at hand. Kirk v. Clark Equip. Co., 991 F.3d 865, 872 (7th Cir. 2021) (quoting Daubert, 509 U.S. at 589).

Under Rule 702 and Daubert, the court engages in a three-step inquiry before admitting testimony. Gopalratnam v. Hewlett-Packard Co., 877 F.3d 771, 779 (7th Cir. 2017)). The court considers (1) the proffered expert's qualifications; (2) the reliability of the expert's methodology; and (3) the relevance of the expert's testimony. Id.

The court first considers the expert's qualifications. An expert need not have particular academic credentials to be qualified; "anyone with relevant expertise enabling him to offer responsible opinion testimony helpful to judge or jury may qualify as an expert witness." Tuf Racing Prods., Inc. v. Am. Suzuki Motor Corp., 223 F.3d 585, 591 (7th Cir. 2000). "The question [the court] must ask is not whether an expert witness is qualified in general, but whether his 'qualifications provide a foundation for [him] to answer a specific question.'" Gayton v. McCoy, 593 F.3d 610, 617 (7th Cir. 2010) (quoting Berry v. City of Detroit, 25 F.3d 1342, 1351 (6th Cir. 1994)). The court looks at each of the

4

expert's conclusions individually "to see if he has the adequate education, skill, and training to reach them." Id.

"A court's determination that an expert possesses the requisite qualifications does not, without more, provide a sufficient basis for admissibility." Kirk, 991 F.3d at 873. The court also must find the opinion to be reliable and relevant. In assessing reliability, courts may consider the following non-exhaustive factors:

> (1) Whether the particular scientific theory can be (and has been) tested;
> (2) whether the theory has been subjected to peer review and publication;
> (3) the known or potential rate of error;
> (4) the existence and maintenance of standards controlling the technique's operation; and
> (5) whether the technique has achieved general acceptance in the relevant scientific or expert community.

Kirk, 991 F.3d at 873 (quoting Deputy v. Lehman Bros., Inc., 345 F.3d 494, 505 (7th Cir. 2003)).

Finally, the court considers whether the proposed expert testimony will assist the trier of fact in determining a fact in issue or understanding the evidence. Chapman v. Maytag Corp., 297 F.3d 682, 687 (7th Cir. 2002).

## III. Plaintiff's Motion to Exclude Opinions of Defense Expert Dr. David Jones (Dkt. No. 109)

### A. Parties' Arguments

The plaintiff moves to exclude Dr. David Jones's opinions and testimony regarding the "mortality adjustment" and "worklife adjustment" applied to reduce the plaintiff's future damages. Dkt. No. 109-1 at 1. He asserts that instead of presenting the plaintiff's full medical care costs up to his life

5

expectancy, Jones applied a "mortality adjustment" to subtract from each year's damages the percentage "possibility" that the plaintiff would be deceased in that year. Id. at 3. The plaintiff presents the following example from Jones's report:

> For example, when [the plaintiff] is 62 years old, according to Jones, there is a 54.6% chance that he will be living and require full compensation for medical expenses to be made whole. However, Dr. Jones subtracts 45.4% of his claimed damages for that year because there is a 45.4% "possibility" that [the plaintiff] will be deceased.

Id. (citing Dkt. No. 109-6 at 3). The plaintiff argues that he "undisputably" will not be made whole under Jones's methodology for years where he is still living. Id. He asserts that the defendant's own life expectancy expert predicts that the plaintiff likely will live to age 66, but Jones's methodology still reduces the plaintiff's damages in the years the parties agree he likely will be alive. Id.

The plaintiff also objects to Jones's "worklife adjustment." Id. The plaintiff states that Jones uses this adjustment to subtract from each year's damages the percentage possibility that the plaintiff would have left the labor force. Id. at 4. The plaintiff presents the following example from Jones's report:

> For example, when [the plaintiff] is 62 years old, Jones believes there was a 66.0% chance that he would have been active in the workforce. Even though it is more likely than not that [the plaintiff] would have been working, Dr. Jones subtracts 34.0% of his claimed wage loss for that year because there is a 34.0% "possibility" [the plaintiff] would have left the labor force by then.

Id. (citing Dkt. No. 109-5 at 5). The plaintiff argues that these adjustments do not predict the plaintiff's actual loss but are "statistical gimmicks" designed to undercompensate the plaintiff for his expected losses. Id. at 5.

6

The plaintiff argues that the court should exclude Jones' mortality and worklife adjustments under Federal Rule of Evidence 702(a) as unhelpful and misleading to the jury. Id. at 6. He asserts that Jones advocates for the jury to compute future damages in a way that is contrary to Wisconsin law. Id. at 7. According to the plaintiff, Wisconsin law instructs the jury to award full compensatory damages for future medical expenses and earning capacity loss for the probable duration of the plaintiff's life. Id. (citing Am. Standard Ins. Co. of Wisconsin v. Cleveland, 124 Wis. 2d 258, 265–66 (Wis. Ct. App. 1985)). The plaintiff argues that these future damages should be awarded to the plaintiff's life expectancy, then discounted to present value. Id. at 9. This includes the plaintiff's probable medical expenses and the gross amount of reasonable lost earnings reduced to the present cash value. Id. at 9–10. The plaintiff contends that the jury must independently determine the plaintiff's "probable length of life," then award damages based on that life expectancy. Id. at 10. The plaintiff argues that the jury must award damages based on probabilities, not possibilities, and that the jury is not permitted to discount damages because it is "possible" the plaintiff may be deceased. Id. at 11–12. The plaintiff says that Jones's methodology does not consider the individual tort victim's damages in favor of an aggregate assessment that undercompensates most individual tort victims. Id. at 13. He argues that even if this method is more "actuarially correct," it is contrary to Wisconsin law and thus should be excluded from consideration. Id.

7

The defendant responds that the plaintiff misrepresents Jones's opinions. Dkt. No. 127 at 2. The defendant argues that Jones calculated the probabilities that the plaintiff would be in the workforce at a range of ages, then multiplied the future potential earnings by the percentage likelihood the plaintiff would be working in that year. Id. at 3. It claims that Jones believes this method is more accurate than assuming that a plaintiff will work to a certain age. Id. at 4. The defendant states that the mortality adjustment accounts for the likelihood that the plaintiff is alive in any given year, which is more accurate than assuming life expectancy to a certain age. Id.

The defendant argues that the plaintiff does not challenge Jones's qualifications as an expert or the reliability of his methodology but rather argues based on vague legal principles that the opinions should be excluded. Id. at 5–6. The defendant contends that it is the plaintiff's burden to establish damages, and that the plaintiff cites no case law that supports excluding Jones's adjustments. Id. at 6. The defendant maintains that the case law the plaintiff cites is inapplicable or too general to support excluding Jones's opinion. Id. at 7. It contends that the Seventh Circuit has approved these types of mortality adjustments. Id. at 8 (citing O'Shea v. Riverway Towing Co., 677 F.2d 1194, 1200 (7th Cir. 1982)). The defendant argues that defense economists are not limited to discounting damages to present value, and says that it has the burden to prove simply that the proposed adjustments are appropriate. Id. at 9–10. According to the defendant, the plaintiff presents no

8

case law supporting his position, so the court should deny his motion. Id. at 10–11.

The plaintiff replies that the reliability of Jones's methodology is not at issue, but rather that the proposed adjustments are contrary to Wisconsin law. Dkt. No. 129 at 3. He argues that the defendant does not contest the factual basis of the plaintiff's motion—namely that Jones'd adjustments reduce his recoverable damages for years he is likely to be alive and working and allocate damages to years where he likely will not be alive or working. Id. at 3–4. According to the plaintiff, if he lives to his life expectancy, Jones'd methodology would leave him without enough funds to pay for his expected medical care. Id. at 4. The plaintiff argues that Jones is applying annuity valuation to a personal injury case, which Wisconsin law prohibits. Id. at 5 (quoting Herman by Warshafsky v. Milwaukee Children's Hosp., 121 Wis. 2d 531, 552–53 (Wis. Ct. App. 1984)). He asserts that the defendant does not substantively respond to many of his arguments or explain how Jones'd opinion satisfies Wisconsin's policy to fully compensate tort victims. Id. at 5–6. The plaintiff asserts that the defendant provides no authority justifying its damages adjustments and ignores the fact that at least one Wisconsin court has excluded Jones's opinion. Id. at 8.

B.    Analysis

The parties do not dispute Dr. Jones' qualifications or the reliability of his methods. Their dispute concerns the relevance of Jones's opinions to the jury's calculation of damages. Neither party cites case law that is directly on

9

point; the Seventh Circuit case the defendant cites is an admiralty action, while the plaintiff's cases deal with the calculation of tort damages generally without addressing the admissibility of specific methods of calculating those damages.

Wisconsin law provides that a plaintiff may recover damages for lost earning capacity, which are "generally arrived at by comparing what the injured party was capable of earning before and after the time of the injury." Klink v. Cappelli, 179 Wis. 2d 624, 630 (Wis. Ct. App. 1993). "It is important that an assessment of future earning capacity not be left to conjecture or speculation." Ianni v. Grain Dealers Mutual Insurance Company, 42 Wis. 2d 354, 366 (Wis. 1969).

> [T]he trier of fact must be allowed to consider the reasonably apparent probabilities as they appear from the evidence, together with such known facts as his age, his education and training, the type of work he was doing before the injury, and the compensation he was receiving, and then in its judgment determine what amount fairly and reasonably represents his loss of earning capacity, reduced to its present value.

Reinke v. Woltjen, 32 Wis. 2d 653, 660 (Wis. 1966).

In the cases the court has surveyed, Wisconsin courts have approved of juries calculating lost future earning capacity based on the plaintiff's work life expectancy—that is, the number of years the plaintiff is expected to work. See, e.g., Johnson v. Misericordia Cmty. Hosp., 97 Wis. 2d 521, 573 (Wis. Ct. App. 1980), aff'd, 99 Wis. 2d 708, (Wis. 1981) (approving damages award based on plaintiff's work life expectancy of 41 and 5/10 years); Acker v. Sullivan, 198 Wis. 2d 388 (Wis. Ct. App. 1995) (expert calculated plaintiff's lost earnings based on a work-life expectancy of age 65). The court did not find any

10

Wisconsin cases specifically addressing the kind of "worklife adjustment" Jones uses.

Jones's worklife adjustment to the plaintiff's future earning capacity is improper under Wisconsin law. To calculate the plaintiff's lost future earning capacity, the finder of fact must determine how many years the plaintiff is expected to work and then assess the plaintiff's earning capacity for those years. For example, it would not make sense for the jury to determine that the plaintiff could have worked until age 65, but then to reduce his earning capacity based on the likelihood that he would *not* be working at age 65. Jones's "potential earnings loss" table (Dkt. No. 109-5 at 5) reduces the plaintiff's potential earnings in each year based on a probability that the plaintiff would *not* be working. That necessarily underestimates the plaintiff's future earnings in the years that the jury decides the plaintiff likely would be working. The court will grant the plaintiff's motion to exclude evidence of Jones's worklife expectancy opinions as irrelevant and confusing to the jury.

The court will exclude Jones's "mortality adjustment" opinions for similar reasons. To support an award of future health care expenses under Wisconsin law, "(1) there must be expert testimony of permanent injuries, requiring future medical treatment and the incurring of future medical expenses; and (2) an expert must establish the cost of such medical expenses." Weber v. White, 272 Wis. 2d 121, 130 (Wis. 2004). In Weber, the plaintiff's expert testified that the plaintiff likely would need twenty to twenty-five chiropractic visits per year for the next thirty-five years of her life. Id. at 133. The court found that this was

11

credible evidence from which the jury could determine the plaintiff's probable future chiropractic expenses. Id. Again, the court approved the use of a defined life expectancy to calculate future medical costs. Discounting the plaintiff's medical expenses in the years the jury believes he will be alive and incurring those expenses would not fully compensate the plaintiff for his injuries. This is also confusing to the jury, because the defendant's own expert opines that the plaintiff will live until age 66; Jones's "potential care costs" contradicts this by stating that there is a 36.7% chance that the plaintiff will have passed away by age 66. See Dkt. No. 109-6 at 3. The court will grant the plaintiff's motion to exclude evidence of Jones's mortality adjustment opinions as irrelevant and confusing to the jury.

## IV. Defendant's Motion to Exclude Opinions of Plaintiff's Expert Dr. Russell Dunn (Dkt. No. 113); Plaintiff's Motion to Strike Sham Declaration of Maureen Schneider and/or Consider Surreply Argument (Dkt. No. 139)

These motions are intertwined, so the court addresses them together.

### A. Parties' Arguments

#### 1. *Defendant's Motion to Exclude Dr. Dunn's Opinions*

The defendant argues that the court should strike portions of the report from one of the plaintiff's experts, Dr. Russell Dunn, because those portions are not supported by sufficient facts or methodologies under Rule 702. Dkt. No. 113 at 2. The defendant states that Dunn was engaged to provide opinions about the polymer engineering of the chair at issue. Id. The defendant seeks to exclude Dunn's opinions related to the applicable engineering standards for chairs of this type as unreliable and irrelevant. Id. at 12. It argues that Dunn

12

bases his opinion on the "flawed" testing conducted by Applied Technical Services (ATS). Id. The defendant states that ATS concluded that the subject chair met the ASTM standard for durability for a residential chair, but did not meet the European standard EN 1728:2012. Id. The defendant argues that the EN standard does not actually have a pass or fail criteria. Id. at 12–13. It asserts that ATS applied the wrong testing standard for arm rests based on the measurement between the arms of the chair. Id. at 13. The defendant contends that even if ATS had performed the tests correctly, the European standard has no bearing on this case because the chair was manufactured and sold in the United States. Id. at 14. It argues that adding information about the European standard would unnecessarily confuse the jury. Id. at 15. The defendant maintains that the ATS testing using the United States standard also was flawed because it relied on an outdated version of the United States standard. Id. The defendant argues that Dunn's opinion on whether the chair meets durability standards is not reliable or scientifically valid because it rests solely on ATS's report. Id.

The defendant says that Dunn's opinions related to risk management and safety analysis are not based on scientific and factual data. Id. at 15–16. According to the defendant, Dunn bases his opinion that the safety of the chair model was inadequately assessed on a risk assessment model used for automotives. Id. at 16. The defendant asserts that Dunn provides no reasoning for using this standard to evaluate a plastic chair. Id. It argues that Dunn failed to consider the defendant's quality assurance procedure, essentially

13

rejecting unfavorable facts from consideration to produce a contrary opinion. Id. at 16–17. The defendant argues that Dunn provides no reasoning to show that an alternative risk management approach would have prevented the chair from breaking. Id. at 17. The defendant argues that these opinions should be excluded as unreliable and irrelevant. Id.

The defendant asserts that Dunn's opinions related to alternative chair designs are not supported by adequate facts, testing or data. Id. at 17. The defendant states that Dunn provides four alternative designs: (1) using a polymer that will not undergo oxidative degradation during use in sunlight; (2) a more robust design using a thicker mold; (3) adopting the design of the defendant's Big Easy Adirondack chair; and (4) the addition of calcium carbonate. Id. The defendant argues that Dunn provides no facts demonstrating how each of these alternatives would cure the alleged risks of the subject chair breaking or how adopting the changes would be feasible for the defendant. Id. at 18–19.

The defendant contends that Dunn's opinions on the "root cause" of the subject chair breaking are unreliable because they do not account for the plaintiff's "severe intoxication" at the time of the incident. Id. According to the defendant, Dunn states that normally a chair would bend prior to breaking, which would have alerted the plaintiff that he should stand up. Id. at 19–20. The defendant asserts that Dunn concluded that the chair did not bend because the plaintiff did not stand up. Id. at 20. The defendant argues that Dunn does not account for the fact that the plaintiff's blood alcohol

14

concentration at the time of the accident was nearly three times greater than the legal limit, which would have diminished the plaintiff's physical and cognitive skills such that he may not have perceived the danger of continuing to sit on the subject chair's arm. Id. The defendant argues that the plaintiff may not have noticed the warning signs of the chair breaking due to his intoxication. Id. It asserts that Dunn's failure to account for this alternative explanation makes his opinion that the chair suddenly broke unreliable. Id. at 21.

Finally, the defendant argues that Dunn's opinions related to the industry's standard of care are not supported by sufficient facts or data. Id. It states that Dunn opined that the defendant failed to meet the standard of care because the defendant failed to test for oxidative degradation or test durability for all markets beyond the United States. Id. The defendant says that it does conduct weatherability testing and considers the concepts underlying oxidative degradation in its testing. Id. It asserts that the chair is sold only in the United States, so international testing standards are not relevant. Id. The defendant maintains that Dunn is not qualified to opine about the standard of care for outdoor furniture manufacturers because he is a chemical engineer. Id. at 22.

The plaintiff responds that the defendant misrepresents Dunn's opinion and improperly criticizes his conclusions rather than challenging the reliability of his methodology. Dkt. No. 125 at 1. He argues that Dunn's reports describe a thorough analysis and a strong, scientific basis for his opinions laid out in detail. Id. at 19. The plaintiff says that it isn't clear what "European testing" the

15

defendant is objecting to; in any event, the plaintiff states that he is not seeking to introduce an opinion on European testing standards unless the defendant "opens the door." Id. at 20. He argues that Dunn used the ATS testing to evaluate the mechanical strength of the chair's arm versus the more robust Big Easy chair arm, not to determine whether there was a violation of European safety standards. Id. at 22. The plaintiff contends that the defendant does not establish that the test itself is irrelevant or unreliable. Id. He argues that Dunn's opinions can't be excluded simply because Dunn did not perform the test himself. Id. at 23.

The plaintiff argues that Dunn's risk management opinions about oxidative degradation are reliable because they are supported by numerous scholarly publications. Id. at 24. He asserts that Dunn has experience as a plastic products engineer/designer and is independently familiar with plastics manufacturing. Id. The plaintiff contends that Dunn need not adopt the defendant's version of events and can rely on disputed facts to reach his opinions if there is evidence to support those facts. Id. at 25.

The plaintiff argues that Dunn presents one primary alternative design in his opinion: antioxidants need to be added to outdoor chairs like the chair at issue. Id. at 26. The plaintiff states that Dunn formed this opinion based on his experience in the polymer industry and on scholarly research. Id. He argues that which polymer should be used to accomplish this is outside the scope of the case. Id.

16

The plaintiff asserts that Dunn performed a microscopic analysis of the chair itself to determine the root cause of the chair's failure. Id. at 27. He argues that the plaintiff's blood alcohol content at the time of the incident is irrelevant because the plaintiff's intoxication is not what caused the plastic to fracture. Id. He contends that there is no evidence that the plaintiff was so intoxicated that he could not have perceived a bending chair arm over the five to ten minutes he was sitting on that chair arm. Id. at 28.

The plaintiff says that there is no basis to exclude Dunn's opinion that the defendant violated its own standard of care. Id. The plaintiff argues that Dunn need not accept the defendant's unsupported assertions that it performed some weatherability testing. Id. at 29. He contends that Dunn is qualified to opine on this issue because of his education and experience as an engineer even though he never worked in the outdoor furniture manufacturing industry. Id. at 29–30.

The defendant replies that because the plaintiff concedes that the European manufacturing standard is not relevant, the court should grant the motion to exclude the portions of Dunn's opinion that reference that standard. Dkt. No. 131 at 3. The defendant argues that the test ATS performed was not intended for a chair with the subject chair's dimensions and therefore that the conclusions from that test are not reliable. Id. at 4–5. It reiterates its argument that Dunn did not rely on sufficient data to establish his opinion about the defendant's risk management and safety analysis. Id. at 5–6. It argues that Dunn's experience is irrelevant if he did not consider all the underlying facts

and data available to him. Id. at 6–7. The defendant characterizes Dunn as "cherry picking" favorable facts to support his opinion. Id. at 7.

The defendant argues that what the plaintiff characterizes as Dunn's "primary solution" to the alleged design flaws is not present in his expert reports and is not supported by his testimony. Id. at 7. It says that in his report, Dunn does not propose adding antioxidants to the chair. Id. The defendant asserts that even if Dunn had included that proposal, its corporate representative testified that there are additives present in the subject chair to protect it from becoming brittle when exposed to sunlight for an extended period. Id. at 8. According to the defendant, Dunn inaccurately assumes that there are no antioxidants present in the chair. Id. at 8–9. The defendant argues that because this opinion is not included in Dunn's report, it automatically should be excluded under the federal rules. Id. at 9–10. The defendant contends that Dunn's failure to include his primary opinion in his report prejudiced the defendant, because the defendant could not address that opinion in its summary judgment materials. Id. at 11. The defendant argues that the plaintiff seems to abandon the other alternative designs proposed in Dunn's report, with the result that the defendant's challenge to those alternative designs is unopposed. Id. at 12–13.

The defendant also reiterates its arguments about the plaintiff's intoxication at the time of the accident, stating that Dunn failed to account for this allegedly obvious alternative cause of the accident. Id. at 13–14. The defendant submits a declaration from its corporate representative to support

18

its argument that it does conduct weatherability testing. Id. at 15. And the defendant reiterates that Dunn is not qualified to opine on the standard of care for an outdoor furniture manufacturer, and that in any event, the defendant met the standard of care. Id. at 16.

### 2. *Plaintiff's Motion to Strike Maureen Schneider Declaration*

With its reply brief, the defendant submitted a declaration from Maureen Schneider, its quality assurance manager. Dkt. No. 134. The declaration states that Schneider confirmed during a deposition that the chair at issue contained additives to protect it from becoming brittle when exposed to sunlight for an extended period. Id. at ¶4. She identifies three polymers used to manufacture the chair and states that each of these polymers contains an antioxidant or "antioxidant package," as well as an antioxidant in the colorant. Id. at ¶¶5–6. Schneider asserts that in discovery, the defendant produced material safety data sheets and technical data sheets for the polymers. Id. at ¶5.

A week after the defendant filed Schneider's declaration, the plaintiff filed a motion strike the declaration, which he characterized as a "sham declaration;" in the alternative, he asked the court to consider his surreply argument regarding the issues raised by the declaration. Dkt. No. 140. The plaintiff contends that Schneider's declaration contradicts the testimony of the defendant's Rule 30(b)(6) representative and evidence produced in discovery and that it contains inadmissible hearsay and false statements. Id. at 1–2. The plaintiff contends that Dr. Dunn opined at length about the effects of oxidative degradation and the importance of antioxidants when protecting a polymer

19

from oxidative degradation. Id. at 3–5. He argues that he properly is using that evidence to advocate for an alternative chair design that incorporates antioxidants. Id. at 5–7. The plaintiff argues that the defendant cannot use this allegedly new opinion to justify submitting Schneider's declaration to rebut the new evidence. Id. at 8.

The plaintiff argues that Schneider's declaration contains facts that conflict with the defendant's prior discovery responses. Id. He argues that the defendant's interrogatory responses and deposition testimony all confirm that the only antioxidant used in the chair was a UV protectant in the colorant. Id. at 9–10. He says that the defendant's materials expert did not identify antioxidants or other additives that would prevent oxidative degradation in the chair's polymers (other than the colorant). Id. at 11–12. The plaintiff contends that no material safety data sheets were produced in discovery and that there is no reference in the documents the defendant produced that support its assertion that antioxidants were included in the chair's polymers. Id. at 13–14. The plaintiff also argues that the examination of the subject chair demonstrates that there were no antioxidants present because the chair displayed severe oxidation after just four months of use. Id. at 15–16.

The plaintiff argues that the defendant is improperly using Schneider's declaration to assert a new factual basis for summary judgment. Id. at 17. He contends that the defendant did not submit any new evidence from Dunn that would justify the defendant's use of Schneider's declaration to add rebuttal facts. Id. at 18. The plaintiff argues that he is not obligated to disclose to the

20

defendant how he plans to use Dunn's opinions at trial. Id. at 19. The plaintiff contends that Schneider's affidavit is a sham because it contradicts the defendant's earlier deposition testimony that no antioxidants were used in the chair other than UV color protection. Id. at 20–22. The plaintiff argues that the defendant produced no documents stating that the UV additive prevents oxidation. Id. at 23–24.

The plaintiff argues that Schneider's declaration also is improper expert testimony from a lay witness that relies on hearsay, so the court cannot consider it on a summary judgment motion. Id. at 24. He argues that Schneider's knowledge of the antioxidant additives in the chair is entirely based on the statements of the defendant's suppliers. Id. at 25. The plaintiff asserts that the defendant has not disclosed any of the suppliers as testifying witnesses or individuals with discoverable information. Id. He maintains that Schneider cannot repeat hearsay statements of unknown declarants for subjects of which she lacks personal knowledge. Id. He argues that Schneider is not designated as an expert witness and so cannot opine that the chair contains unidentified antioxidants that protect the chair from exposure to the elements. Id. at 26. The plaintiff argues that even if the court does not strike the declaration, it should consider the plaintiff's arguments as a sur-reply to Schneider's declaration. Id. at 27–28.

The defendant responds that Schneider's declaration is not a sham but merely a response to the plaintiff's "cherrypicked" "sound bites" from Dunn's opinions. Dkt. No. 144 at 2. It argues that Dunn's "primary" opinion—that the

21

chair needed antioxidants added to it—is not included in Dunn's expert reports. Id. at 4–6. The defendant asserts that the plaintiff articulated this new primary opinion as a counter to the defendant's summary judgment arguments. Id. at 6–7. The defendant argues that the information presented in Schneider's declaration is not new and is supported by the deposition testimony of the defendant's Rule 30(b)(6) representative. Id. at 9. The defendant asserts that Schneider testified on behalf of the company that the chair contained additives in the colorant to protect the resin of the chair, even though she did not use the word "antioxidant." Id. at 9–10. The defendant asserts that it did produce several documents stating that its polymer suppliers used stabilizers or additives in the polymers they provided to the defendant. Id. at 11–12. It asserts that there was no need for it to add additional antioxidants to the chair because the supplied polymers already contained antioxidants. Id. at 13. The defendant argues that its expert testified that he believed there were antioxidants in the polymers. Id. at 13–14.

The defendant argues that Schneider's declaration is not a sham because it does not actually contradict Schneider's prior deposition testimony. Id. at 14–15. The defendant contends that the plaintiff did not question Schneider about antioxidants added to the polymers or about antioxidants contained in the polymers the defendant received from suppliers. Id. at 15. The defendant asserts that Schneider stated that the UV protectant in the chairs acted as an antioxidant and protected the chair from becoming brittle. Id. at 16. It argues

that the documents produced in this case similarly support the statements Schneider makes in the declaration. Id.

The defendant argues that even if Schneider stated at deposition that there were no antioxidants in the chair's polymers, that statement is wrong and requires correction. Id. at 17. The defendant asserts that there are multiple documents supporting the statement that there are antioxidants in the chair as well as the defendant's expert's testimony. Id. The defendant contends that a declaration is not a sham if it is intended to correct an inaccurate statement. Id.

The defendant argues that it is entitled to introduce Schneider's declaration to respond to the arguments the plaintiff made in response to summary judgment. Id. at 18. It argues that the plaintiff created a new argument that was not present in Dunn's expert opinions, and that there is no prohibition against submitting a new affidavit to respond to that argument in a reply brief. Id. The defendant argues that it did not present this evidence in its motion for summary judgment because it believed it was not relevant. Id. at 19.

The defendant says that Schneider's declaration is not hearsay because Schneider submitted it on behalf of the company as a Rule 30(b)(6) witness. Id. at 20–21. The defendant contends that Schneider need not have personal knowledge because she is representing the company. Id. at 21. It argues that Schneider is not holding herself out as an expert on antioxidants and polypropylene materials, but is representing only that she is aware of what materials are used in manufacturing the defendant's chair. Id. at 22. The

defendant further argues that the court should not consider the plaintiff's brief as a sur-reply because the court's local rules do not permit sur-replies. Id. at 24. The defendant argues that the plaintiff was required to separately seek leave to file a sur-reply. Id.

In reply, the plaintiff reiterates that Dunn's opinions regarding the use of antioxidants were clearly stated in his expert report which was disclosed to the defendant over a year ago. Dkt. No. 147 at 3–4. The plaintiff argues that Dunn's decision to include alternative designs other than adding antioxidants to the chair does not mean that the plaintiff cannot emphasize the antioxidant design over the other alternative designs. Id. at 5. The plaintiff argues that Dunn's report does not dictate the plaintiff's trial strategy and provides ample notice to the defendant that the plaintiff may highlight the importance of antioxidants at trial. Id. at 5–6.

The plaintiff continues to argue that Schneider's declaration is a sham because it contradicts the defendant's prior interrogatory responses that there are no antioxidant additives in the chair's resin. Id. at 6–8. He asserts that the defendant's responses are not ambiguous and that they clearly contradict Schneider's declaration. Id. at 8. He asserts that Schneider never was designated to testify about antioxidant additives on behalf of the defendant; the plaintiff states that other corporate representatives were designated to discuss these related topics. Id. at 9. The plaintiff argues that he was not on notice of any need to depose the defendant's polymer suppliers because all the defendant's discovery responses indicated that the polymers had no

antioxidants added to them. Id. at 10–11. The plaintiff maintains that the defendant cannot use Rule 30(b)(6) witnesses to circumvent the hearsay rule. Id. at 12. He argues that Schneider cannot repeat hearsay nor express an expert opinion about the presence of antioxidants in the chair's polymers. Id. The plaintiff argues these subjects are not even within the scope of Schneider's Rule 30(b)(6) designation. Id.

The plaintiff argues that the defendant is assuming without evidence that the unspecified "additives" or "stabilizers" referenced in the material safety data sheets are antioxidants designed to protect the chair from oxidative degradation. Id. at 13. He asserts that the material safety data sheets indicate the opposite, stating that the resin should be kept away from direct sunlight and oxidating agents. Id. at 14–15. He argues that there are many additives that could be added to a resin that do not provide antioxidant qualities. Id. at 15–16. The plaintiff contends that the presence of these additives and stabilizers cannot establish that there was an antioxidant in the chair's resin. Id. The plaintiff argues that to the extent that the defendant concedes that it made a mistake in prior discovery responses by stating that there were no antioxidants in the chair, it provides no justification for that mistake or explanation as to why it could not remedy the error sooner. Id. at 16.

B.  Analysis

1.  *Maureen Schneider's Declaration*

"In this circuit the sham-affidavit rule prohibits a party from submitting an affidavit that contradicts the party's prior deposition or other sworn

testimony." James v. Hale, 959 F.3d 307, 316 (7th Cir. 2020) (citing Dunn v. Menard, Inc., 880 F.3d 899, 910 (7th Cir. 2018)). The Seventh Circuit recognizes three exceptions to the sham affidavit rule. Id. at 317. An affidavit containing "newly discovered evidence" is permissible, as is one that corrects a "demonstrably mistaken" statement. Id. (citing Adelman-Tremblay v. Jewel Cos., Inc., 859 F.2d 517, 520 (7th Cir. 1988); Russell v. Acme-Evans Co., 51 F.3d 64, 68 (7th Cir. 1995)). Finally, the Seventh Circuit allows a party to submit "a supplemental affidavit that clarifies ambiguous or confusing deposition testimony." Id. (citing Bank of Ill. v. Allied Signal Safety Restraint Sys., 75 F.3d 1162, 1171–72 (7th Cir. 1996))

The plaintiff objects to the following statements Schneider makes in her declaration: that the Real Comfort Adirondack chair contains an "antioxidant to protect the polypropylene from exposure to the elements"; that Schneider testified at her deposition that "additives are present in the materials used to manufacture" the chair that protect the chair from becoming brittle when exposed to sunlight for an extended period of time; that the polymers used to manufacture the chair "contain[] an antioxidant and/or antioxidant package;" and that the defendant produced data sheets for the polymers used in the chair that reflect this information. Dkt. No. 134 at ¶¶3–5. The plaintiff asserts that the defendant's interrogatory responses confirmed that there are no antioxidants in the chair except for those contained in the chair's colorant, as did the defendant's Rule 30(b)(6) witnesses. The defendant argues that Schneider's responses are not contradictory because the plaintiff asked

26

whether *the defendant* added antioxidants to the chair's polypropene or resin blend, and did not ask whether those materials *already contained antioxidants* from the material suppliers.

The court disagrees with the defendant. The defendant's Rule 30(b)(6) representative testified:

> Q Did you pay attention to whether the polymers you were involved in selecting had antioxidants added to it?
> A No. That would be more in the color.
> Q Was any -- strike that. Was any antioxidant added to the RealComfort resin blend other than as it may relate to color?
> A No.

Dkt. No. 119-10 at 23, Tr. p. 22:1–9. The plaintiff asked whether "any antioxidant" was added to the resin blend. The plaintiff did not specifically ask whether *the defendant* added the antioxidant or whether *the suppliers* added the antioxidant. The question could fairly be read as asking whether *anyone* added antioxidants to the chair's resin blend. The Rule 30(b)(6) representative's response was that no antioxidant was added to the chair's resin blend, while Schneider's declaration states that an antioxidant *was* added to the resin. That is a direct contradiction.

The defendant contends that Schneider's declaration falls under the sham affidavit rule's exception for correcting a mistaken statement or clarifying prior testimony. But the Seventh Circuit requires that the declarant invoking this exception "explain[] the contradiction or attempt[] to resolve the disparity." Babrocky v. Jewel Food Co., 773 F.2d 857, 861 (7th Cir. 1985). The defendant provides no explanation as to why its Rule 30(b)(6) representative testified that

27

there were no antioxidants in the chair. The defendant claims that the data sheets it provided in discovery reflect that there were antioxidants added to the polymers used to manufacture the chair. If that is so, it appears that the defendant's Rule 30(b)(6) representative did not testify consistently with the information provided in those data sheets.

The data sheets themselves do not support the defendant's assertion that Schneider was correcting a "demonstrably mistaken" statement. The data sheet from resin supplier Carmel Olefins states that the resin has a "basic additive package," dkt. no. 138-7, but warns the user to keep the resin away from "heat, direct sunlight and strong oxidizing agents," dkt. no. 145-6 at 3. Pinnacle Polymers' data sheet states that its polymer contains "proprietary stabilizers" but that it should be kept "away from strong oxide agents" and direct sunlight. Dkt. No. 145-5 at 2, 4. Formosa Plastics states that its stabilizers protect the resin from "stress cracking" and provide "good stiffness" and "heat performance," but does not state that those stabilizers have antioxidant properties. Dkt. No. 138-8 at 1. The defendant provides no support for an inference that these additives or stabilizers are "antioxidant[s] and/or antioxidant package[s]." These documents do not provide a basis for finding that the defendant was "demonstrably mistaken" when it stated that the chair's resin contained no antioxidants.

The defendant also argues that its materials expert, Marc Zupan, testified that there was an antioxidant package supplied by the resin manufacturer. But Zupan admitted in his deposition that he had not "studied"

whether there were any antioxidants in the chair, only that it was his "understanding of the record" that the resin manufacturer provided an antioxidant in the polymer. Dkt. No. 138-20 at 2–3, Tr. pp. 50:3–51:1. The defendant cannot rely on Zupan's statements when Zupan did not investigate the presence of antioxidants in the chair. Zupan's statements rely on the unspecified "record" that the resin manufacturer provided an antioxidant package. It is not clear from the record before the court that that is the case.

Because Schneider's declaration directly contradicts the defendant's prior testimony and no exception applies, the court will grant the plaintiff's motion to strike Schneider's declaration as a sham affidavit. The court has not considered Schneider's declaration when reviewing the defendant's motions to exclude Dr. Dunn's opinions or for summary judgment.

2.    *Dr. Dunn's Opinions*

The defendant first argues that Dunn's opinions related to applicable engineering standards and testing performed on the exemplar chairs are unreliable and irrelevant. The parties do not contest Dunn's qualifications, so the court need not address that issue. See Kirk, 991 F.3d at 873–74 (district court did not err by proceeding to the reliability determination where parties did not challenge expert's qualifications).

When assessing reliability, the focus "must be solely on principles and methodology, not on the conclusions that they generate." Daubert, 509 U.S. at 595; see also Smith v. Ford Motor Co., 215 F.3d 713, 718 (7th Cir. 2000) ("[W]e emphasize that the court's gatekeeping function focuses on an examination of

29

the expert's methodology."). "The soundness of the factual underpinnings of the expert's analysis and the correctness of the expert's conclusions based on that analysis are factual matters to be determined by the trier of fact, or where appropriate, on summary judgment." Ford Motor Co., 215 F.3d at 718; see also Manpower, Inc. v. Ins. Co. of Pa., 732 F.3d 796, 806 (7th Cir. 2013) ("Reliability . . . is primarily a question of the validity of the methodology employed by an expert, not the quality of the data used in applying the methodology or the conclusions produced."). "The district court usurps the role of the jury, and therefore abuses its discretion, if it unduly scrutinizes the quality of the expert's data and conclusions rather than the reliability of the methodology the expert employed." Manpower, 732 F.3d at 806.

Relevant evidence is "that which has 'any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" Daubert, 509 U.S. at 587 (quoting Fed. R. Evid. 401). Rule 702's "basic standard of relevance thus is a liberal one." Id. The Rule 702 requirement that the expert's evidence or testimony must "assist the trier of fact to understand the evidence or determine a fact in issue" "goes primarily to relevance." Id. at 591.

The defendant contends that Dunn's opinions are not reliable because he relies solely on testing that ATS performed on the chair. This argument has no merit; an expert is entitled to base his opinion on reports or data generated by another. See NutraSweet Co. v. X-L Eng'g Co., 227 F.3d 776 (7th Cir. 2000) (quoting Fed. R. Evid. 703). The defendant next argues that ATS's conclusions

are unreliable and irrelevant because ATS concluded that the subject chair did not pass certain European testing standards for durability. These objections go to the conclusions that *ATS* drew from its testing, not *Dunn's* methodology. The plaintiff has clarified that he does not intend to introduce opinions from Dunn that the chair failed any European durability standard. Dunn does not opine that the chair passed or failed any particular industry standards; he opines, based on ATS's mechanical strength testing, that the subject chair bowed significantly. The defendant does not argue that ATS's mechanical strength testing is substantively unreliable. And whether the chair can withstand certain amounts of force without breaking is relevant, because the core issue in the case is whether the chair was properly designed and manufactured to withstand certain amounts of force. Dunn is free to rely on ATS's testing when forming his opinions about the durability of the chair. At trial, he will be subject to cross-examination on these issues and the factfinder will determine the weight to give these conclusions. The defendant has not established that ATS's testing is unreliable or that the conclusions are not relevant, so the court will deny the defendant's motion to exclude Dunn's opinions based on the ATS testing.

The defendant next argues that Dunn's opinions related to risk management lack sufficient scientific and factual foundation because he relies on two documents when forming these opinions and excludes consideration of the defendant's quality assurance standard operating procedures. Dunn testified at his deposition that he relied on the safety analysis documents

31

provided in discovery. Dkt. No. 115-7 at 20, Tr. p. 112:4–17. The defendant provides no support for its assertion that Dunn's reliance on two documents to form an opinion is inherently unreliable, or that these specific documents are unreliable. As for the defendant's quality assurance standard operating procedures, it is unclear from the record whether the defendant actually applied those "standard operating procedures" to assess the weatherability of the chair at issue. The defendant's Rule 30(b)(6) representative testified at deposition that its last UV stabilization test was performed on a resin sample "[b]etween five and ten years ago." Dkt. No. 119-12 at 70–71, Tr. pp. 69:23–70:2. Dunn's decision not to consider a plan that was not actually implemented does not make his opinion unreliable. At trial, the defendant will have the opportunity to cross-examine Dunn regarding the documents he did or did not consider when forming these opinions, but the defendant has not established that Dunn's methodology was so unreliable as to warrant exclusion of his opinions on risk management.

Next, the defendant argues that Dunn's alternative design proposals are not supported by sufficient facts or data or are not the product of reliable principles and methods. The plaintiff responds that the defendant ignores Dunn's "primary solution," which is that antioxidants need to be added to the chair to prevent oxidative degradation. The defendant replies that Dunn does not clearly state this "primary solution" in his report and in any event, the chair *does* have antioxidants added to it. As the court has discussed, it is not clear from the record whether the chair did have antioxidants added to it. And

32

Dunn's expert report extensively discusses the effects of oxidative degradation on outdoor chairs and the fact that the lack of antioxidants can contribute to this effect. See Dkt. No. 112-23 at 21–25, 31, 36–37. Dunn states that "antioxidants extend the useful life of [polypropylene] when it is exposed to oxygen in the air or some other oxidizing agent(s)." Id. at 21. Dunn determined that it was "not clear if the base polymer [in the chair] contains any antioxidants and/or UV protection." Id. at 31. Dunn's proposed alternative design is "the use [of] a polymer that will not undergo oxidative degradation during use in sunlight" as well as a "more robust design" with "increased molding thickness." Id. at 34. Dunn's report makes clear that he believes oxidation is the primary issue contributing to the failure of the chair and that an alternative design would address the oxidation problem. Dunn presents the addition of antioxidants as a possible way to combat oxidation. Dunn's report is sufficient to place the defendant on notice that the plaintiff may argue that the addition of antioxidants to the chair's polymer is a safer alternative design. The defendant has not presented any argument that this opinion is unreliable or unsupported by sufficient facts or data. The court will deny the defendant's motion to exclude Dunn's opinions as to alternative designs.

The defendant argues that Dunn's opinions on the root cause of the chair's failure are not reliable because he fails to consider the plaintiff's intoxication at the time of the accident. Dunn opines that the arm of the chair fractured because it had become brittle due to oxidative degradation. See Dkt. No. 119-2 at 37. He does not offer any opinions about the plaintiff's

33

intoxication. But the defendant does not explain why Dunn's analysis of the chair's embrittlement, isolated from the plaintiff's intoxication, means that his methodology is unreliable. At its core, this argument is a challenge to Dunn's conclusions. At trial, the defendant will have the opportunity to cross-examine Dunn about the plaintiff's intoxication and whether it does, or does not, impact his opinions about the cause of the chair's failure or provide an alternative explanation for the chair's failure. The fact that an alternative explanation or contributing cause exists does not make Dunn's opinion unreliable. The court will deny the defendant's motion to exclude Dunn's opinions about the root cause of the chair's failure.

The defendant argues that Dunn's opinions related to the defendant not meeting the outdoor furniture industry's standard of care are not supported by sufficient facts or data. The defendant argues that Dunn incorrectly assumed that the defendant does not conduct weatherability testing or test for the risk of oxidative degradation. But the defendant's corporate representative testified at deposition that the defendant did not run tests determining the effect of oxidative degradation on the subject chair. Dkt. No. 119-11 at 19, Tr. p. 18:22–25. Dunn was entitled to rely on the representative's sworn testimony to conclude the defendant did not test for oxidative degradation. The court cannot conclude Dunn was wrong in relying on the information the defendant produced in discovery.

The court will deny the defendant's motion to exclude Dunn's opinions about the defendant not meeting the standard of care, and will deny the defendant's motion to exclude Dunn's opinions.

## V. Defendant's Motion to Exclude Opinions of Plaintiff's Expert Dr. Clifford Tribus (Dkt. No. 114)

### A. Parties' Arguments

The defendant argues that the court should exclude the plaintiff's expert Dr. Clifford Tribus because he was not timely disclosed as a principal expert and was improperly designated as a rebuttal expert. Dkt. No. 114 at 2. The defendant alleges that the plaintiff's principal expert witness disclosures were due on June 14, 2024 and his rebuttal witness disclosures were due on December 31, 2024. Id. at 2–3. The defendant states that the plaintiff retained Tribus in the fall of 2024 and disclosed him as a rebuttal witness on December 30, 2024. Id. at 3. It states that Tribus reported that he was retained to opine about the plaintiff's Diffuse Idiopathic Skeletal Hyperostosis (DISH). Id. The defendant contends that it did not disclose an expert witness to opine on the plaintiff's DISH—in other words, it contends that Tribus was not retained to rebut any defense witness testimony and so should not have been designated as a rebuttal witness. Id. at 8–9. The defendant argues that Tribus did not review or rely on any of the defendant's expert reports when formulating his opinion. Id. at 9.

The defendant asserts that the plaintiff's untimely disclosure of Tribus as a principal expert witness was unjustified and prejudicial. Id. The defendant argues that the plaintiff knew of his DISH diagnosis prior to the incident at

35

issue in this case and well before the June 2024 expert witness disclosure deadline. Id. at 10. The defendant asserts that Tribus's report relies on medical records from 2018 and 2021, records that were available to him well in advance of the expert witness disclosure deadline. Id. The defendant maintains that there is no excuse for the plaintiff not to have designated Tribus in a timely manner. Id. at 10–11. It says that this untimely disclosure prejudiced the defendant because it could not retain its own expert on DISH. Id. at 11. The defendant argues that this prejudice cannot be cured because discovery is closed and dispositive motions have been filed. Id. at 11–12.

The defendant argues that even if Tribus had been timely designated, the court should exclude his report because it is not reliable. Id. at 13. The defendant asserts that Tribus did not base his opinions on sufficient facts or data because he reviewed only the plaintiff's MRI and CT scans when formulating his opinions. Id. The defendant contends that this is insufficient to develop a reliable opinion as to how DISH affected the plaintiff's injuries from the incident. Id. at 13–14. The defendant maintains that Tribus was not aware of basic facts of the case, such as the plaintiff's intoxication, making his opinion unreliable. Id. at 14. It argues that Tribus's past experience with DISH patients cannot assist him in developing an opinion here because those cases were too dissimilar to the plaintiff's. Id. at 14–15. The defendant says that Tribus conceded that most of his opinions cannot be confirmed with a medical degree of certainty. Id. at 15. It contends that Tribus did not rely on any specific literature or studies to form his opinions, instead relying on his

36

experience over the years to make generic statements about DISH. Id. at 15–16. The defendant argues that Tribus accepted the version of events presented by the plaintiff's counsel and did not make a proper inquiry into the factual underpinnings of his opinions. Id. at 16–18.

The plaintiff responds that Tribus is properly designated as a rebuttal expert because his opinions respond to the opinions of the defendant's biomechanical expert, Steven Rundell. Dkt. No. 123 at 7. The plaintiff states that Rundell's opinion is that the plaintiff did not simply fall from a seated position on the chair's arm but rather was in motion toward the chair at the time of the fall. Id. at 8. The plaintiff argues that Rundell did not consider the plaintiff's preexisting DISH when forming this opinion. Id. at 9–10. He says that he retained Tribus to rebut Rundell's opinion that the plaintiff "must have experienced a high force trauma to have sustained such a devastating spinal injury." Id. at 10. Based on Tribus's opinion, the plaintiff contends that DISH rendered his spine brittle and more susceptible to a severe injury from a relatively minor fall. Id. at 10–11. He asserts that even though Tribus's opinion could have been offered in his case-in-chief, that does not necessarily mean that it is not rebuttal evidence. Id. at 18. The plaintiff asserts that Tribus's opinion "directly rebuts" Rundell's opinion because Tribus opines that "(1) [the plaintiff's] diagnostic imaging do not show a higher force injury and (2) that it is well accepted in spinal medicine that the most common source of spinal injuries in DISH patients is low force trauma such as a ground-level fall." Id. at

19. He argues that this directly contradicts Rundell's opinion that the plaintiff experienced a high force trauma. Id.

The plaintiff contends that Tribus's expert report is reliable and admissible because Tribus's opinion is based on his experience. Id. at 20. He argues that medical opinion testimony is an area where experience-based testimony is particularly appropriate, so a well-qualified physician can satisfy the reliability standard by testifying based on his experience. Id. at 21–22. The plaintiff asserts that Tribus has extensive experience with DISH patients, has authored publications related to spinal injuries in DISH patients and has thirty years of research and teaching experience related to spinal issues. Id. at 23. The plaintiff maintains that Tribus reviewed the plaintiff's medical records to evaluate his injury like any medical professional would evaluate a patient. Id. at 24.

The plaintiff argues that because Tribus was not designated as a principal expert, he need not opine about the cause of the plaintiff's injury with complete certainty; he need only rebut defense expert Rundell's opinions. Id. at 24–25. The plaintiff argues that medical expert testimony need only be given to a "reasonable degree of medical probability" and not to absolute certainty. Id. at 25 (quoting Pucci v. Rausch, 51 Wis. 2d 513, 518–19, (Wis. 1971)). The plaintiff argues that in his report, Tribus asserted that his opinions were stated to a reasonable degree of medical certainty. Id.

The plaintiff says that Tribus was entitled to rely on facts presented to him by the plaintiff's counsel. Id. at 26. The plaintiff contends that he

38

summarized the basic facts giving rise to the plaintiff's injury and that there was no requirement that Tribus independently research the facts of the case to opine about the plaintiff's DISH. Id. at 27. The plaintiff argues that his intoxication at the time of the injury is not relevant and that Tribus stated in his deposition that the plaintiff's blood alcohol content likely would not change his opinions. Id. at 28.

The defendant replies that Tribus is not a rebuttal expert to Rundell because Rundell opined on the biomechanics and physics of how the chair broke, while Tribus opines about the plaintiff's medical condition. Dkt. No. 130 at 2–3. The defendant argues that Tribus—a medical doctor specializing in spine injuries—cannot rebut Rundell's analysis of physics and engineering principles leading to the chair's collapse. Id. at 4–5. The defendant reiterates that Tribus did not review or rely on Rundell's opinions or deposition testimony to formulate his rebuttal opinions. Id. at 5. The defendant asserts that the plaintiff's rebuttal witness disclosure does not state that Tribus was retained to rebut Rundell's opinions. Id. at 6. It argues that Tribus even testified at deposition that he could not opine on the mechanics of the plaintiff's injury or how he fell, which is what Rundell's opinion analyzes. Id. at 7. The defendant maintains that the need for testimony regarding the plaintiff's DISH was well-known to both the parties before Rundell submitted his report because both were aware of the plaintiff's pre-existing diagnosis. Id. at 8–9.

The defendant argues that Tribus's qualifications and experience are not sufficient to render his opinions admissible. Id. at 10–11. It contends that for

39

his opinion to be admissible, Tribus still must base his opinions on sufficient facts or data and reliably apply them to the facts of the case. Id. at 11. The defendant reiterates its arguments that Tribus did not review any documents except the plaintiff's MRI and CT scan imaging and that he uncritically accepted the plaintiff's version of events when forming his opinions. Id. at 12. The defendant argues that Tribus did not rely on medical literature or anything other than his generic knowledge of DISH to opine on the plaintiff's condition. Id. at 13. The defendant argues that Tribus is not qualified to opine on the "mechanism" of the plaintiff's injury to properly rebut Rundell's opinion. Id. at 14–15.

B.  Analysis

The defendant's first argument is that Tribus was not properly designated as a rebuttal expert. Federal Rule of Civil Procedure 26(a)(2) governs discovery related to experts. The rule requires parties to disclose the identities of experts, discusses which experts must provide written reports and what must be in those reports and prescribes the timing for making these disclosures. Rule 26(a)(2)(D)(ii) defines a rebuttal expert as one who offers testimony "intended solely to contradict or rebut evidence on the same subject matter" identified by another party's expert. "The proper function of rebuttal evidence is to contradict, impeach or defuse the impact of the evidence offered by an adverse party." Peals v. Terre Haute Police Dep't, 535 F.3d 621, 630 (7th Cir. 2008). "Testimony offered only as additional support to an argument made in a case in chief, if not offered 'to contradict, impeach or defuse the impact of

40

the evidence offered by an adverse party,' is improper on rebuttal." Id. (citing United States v. Grintjes, 237 F.3d 876, 879 (7th Cir. 2001)). In determining whether an expert is a "rebuttal" expert, the court's inquiry should focus on "whether the opinions expressed in a rebuttal report rebut the same *subject matter* identified in the other party's expert report." Green v. Kubota Tractor Corp., Case No. 09 CV 7290, 2012 WL 1416465, at *5 (N.D. Ill. Apr. 24, 2012) (emphasis added).

Tribus's report rebuts the subject matter identified in Rundell's report. Rundell's report contains a "biomechanical analysis" of the plaintiff's purported injury. Dkt. No. 119-32 at 6. Rundell states he "was retained to determine whether the available descriptions of the incident align with the laws of physics and the physical evidence" and specifically "to investigate and analyze whether the incident could have occurred with [the plaintiff] and Mrs. Gerber seated statically in the chair at the time of its fracture." Id. at 38. Rundell considered the plaintiff's injuries to reconstruct how he might have fallen from the chair, determining that "neck hyperextension injuries, like those documented for [the plaintiff], do not occur at speeds below nine miles per hour" and that the estimated speed of the plaintiff's fall from a static seated position was below that speed. Id. at 39–41. Tribus states that he was retained to opine "about the extent of DISH in [the plaintiff's] spine, his increased risk of injury due to DISH, and potential mechanisms of injury to cause the injuries [the plaintiff] sustained." Dkt. No. 119-29 at 1. Tribus opines that because of the plaintiff's DISH, a fall from a seated position in a chair could have caused his injuries. Id.

41

Tribus's report rebuts Rundell's conclusion that the severity of the injury indicates the plaintiff must have been in motion when the injury occurred. Tribus was properly designated as a rebuttal expert.

But Tribus's report still must meet <u>Daubert</u>'s standards of admissibility. The defendant argues that Tribus's opinions are not based on sufficient facts or data and are unreliable. Tribus testified that he relied on the plaintiff's CT scan and MRI imaging to determine that a low velocity fall could have caused the plaintiff's injuries; he did not review any scholarly publications or perform additional research to come to his opinion. Dkt. No. 119-30 at 31–33, Tr. pp. 30:15–32:3. This is despite the fact Tribus wrote in his report that he had reviewed literature regarding DISH. Dkt. No. 119-29 at 1. Tribus testified that he had a "generic approach" to considering DISH patients' injuries. Dkt. No. 119-30 at 33, Tr. p. 32:2–3; <u>see also</u> <u>id.</u> at 31, Tr. p. 30:5–11 (testifying that "I can't quote you specific papers I've read recently in preparation for this, but it is a statement I could make in a generic way and well supported by the literature."). Tribus's opinion is not based on sufficient facts or data.

Although the plaintiff argues that Tribus's experience with spinal injuries is sufficient to establish the reliability of his opinion, "the expert 'must explain how that experience leads to the conclusions reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts.'" <u>Fiserv Sols., Inc. v. Endurance Am. Specialty Ins. Co.</u>, Case No. 11-C-0603, 2014 WL 1415339, at *3 (E.D. Wis. Apr. 14, 2014) (quoting Fed. R. Evid. 702 advisory committee notes). "Rule 702 does require . . . that the expert

42

explain the 'methodologies and principles' that support his opinion; he cannot simply assert a 'bottom line.'" Metavante Corp. v. Emigrant Sav. Bank, 619 F.3d 748, 761 (7th Cir. 2010) (quoting Minix v. Canarecci, 597 F.3d 824, 835 (7th Cir. 2010)). Tribus's repeated statements that he formed his opinion based on a "generic approach" to DISH injuries does not explain the "methodologies and principles" underlying his opinion in this specific case. Further, though Tribus states in his opinion that "the literature demonstrates" that DISH patients could suffer severe consequences from slow falls, his testimony reveals that he could not identify any piece of "literature" upon which he relied to form this opinion. That calls into question the reliability of his conclusions. The court cannot determine if the "literature" on which Tribus relied is sufficient because Tribus does not identify that literature. The court will grant the defendant's motion to exclude Tribus's opinions.

## VI. Defendant's Motion to Exclude Report and Testimony of Plaintiff's Expert Joellen Gill (Dkt. No. 116)

### A. Parties' Arguments

The defendant moves to exclude the plaintiff's expert witness, Joellen Gill, retained by the plaintiff to opine about the underlying root cause of the plaintiff's accident. Dkt. No. 118 at 1. The defendant argues that in her deposition, Gill conceded that she has no specialized knowledge or experience about the chair and stated multiple times that she was not a chair designer or an expert in chair design. Id. at 6–7. It contends that Gill's opinions about the chair's design should be excluded because she is not qualified to opine about the chair's design. Id. at 7.

43

The defendant says that Gill's remaining opinions about the plaintiff's behavior and the defendant's safety systems are unreliable and inadmissible. Id. According to the defendant, Gill did no independent research or testing for this case, instead relying on documents provided to her by the plaintiff's counsel. Id. at 7–8. The defendant argues that Gill had no basis to determine that the plaintiff's behavior on the night of the incident was "consistent with foreseeable human behavior." Id. at 8. It asserts that Gill did not consider the plaintiff's intoxication or the testimony from the witnesses to the incident. Id. It says that Gill stated that she did not believe that the plaintiff engaged in any decision-making process about whether to sit on the chair arm, which the defendant contends is directly contradicted by the plaintiff's testimony. Id. at 8–9.

The defendant argues that Gill baselessly criticized statements on the defendant's website about the defendant's safety testing and compliance with ASTM standards for its furniture products. Id. at 9–10. It contends that Gill assumes, without evidence, that the defendant did not do anything to make its products safe beyond complying with ASTM standards. Id. at 10. The defendant asserts that Gill has no specialized knowledge about or experience with ASTM standards or outdoor furniture manufacturing in general, as evidenced by her testimony that she did not understand why a product would be manufactured differently for residential as opposed to commercial use. Id. at 10–11. The defendant argues that Gill puts undue emphasis on Consumer Product Safety Commission (CPSC) documents related to the chair, which she

44

characterizes as "prior similar incidents" without knowing whether the facts of the incidents were similar to the facts of this case. Id. at 11–12. The defendant maintains that Gill admits that she was not aware of whether the CPSC determined the defendant needed to take some corrective action to make the chair safer after these reports or whether the defendant complied with any such requirements. Id. at 12. The defendant asserts that the "mere existence" of CPSC activity has no relevance as to the chair's safety. Id. at 13.

The defendant argues that Gill relied on inaccurate or incomplete evidence. Id. According to the defendant, Gill relied on an outdated version of the chair's warning label to form her opinion about the efficacy of the warning label. Id. It says that Gill reviewed the recorded statement of only one witness instead of reviewing the sworn deposition testimony of the other witnesses to the incident. Id. at 14. The defendant contends that Gill was not aware that the plaintiff was seriously intoxicated at the time of the incident and that she failed to consider the impact of his intoxication on the accident. Id. at 14–16. The defendant argues that excluding these facts from consideration without explaining why renders Gill's opinion unreliable. Id. at 17.

The plaintiff responds that Gill is an expert in "human factors engineering," which regularly is recognized as an appropriate area for expert testimony. Dkt. No. 124 at 1. According to the plaintiff, human factors engineering combines "traditional engineering disciplines . . . with the science of human behavior" to analyze "whether, in light of predictable human behavior, the design or condition of the subject item poses a potential hazard."

45

Id. at 5 (quoting Michaels v. Mr. Heater, Inc., 411 F. Supp. 2d 992, 999 (W.D. Wis. 2006)). The plaintiff argues that Gill is qualified because she has a bachelor's degree in human factors engineering and has extensive work experience in the field. Id. at 6–7. The plaintiff contends that Gill's first four opinions do not address the chair's design and are within Gill's field of expertise. Id. at 13. He asserts that Gill describes the defendant's safety program as deficient for failing to consider the foreseeable behavior of the end user of its products. Id. at 14. The plaintiff argues that Gill need not have any specialized knowledge about the product in question or the industry to competently testify. Id. at 15–16 (collecting cases).

The plaintiff asserts that Gill's remaining opinions are reliable and admissible. Id. at 17. He contends that the defendant misrepresents Gill's report and testimony by arguing that her report and her testimony were in conflict. Id. He says that Gill need not have performed her own testing to identify the root cause of the accident using a human factors engineering analysis. Id. The plaintiff asserts that Gill performed additional, independent research beyond what the plaintiff's counsel provided to her. Id. at 18. The plaintiff argues that even if Gill had not reviewed additional materials, her testimony still would be admissible because the facts presented to her by the plaintiff's counsel are consistent with the evidence. Id.

The plaintiff argues that the defendant's own testing demonstrates the accuracy of Gill's opinion. Id. at 19–20. He says that the defendant purportedly "tested" the strength of its chair arms because it was aware that the user might

46

sit on the arm of the chair. Id. at 20. The plaintiff argues that this is consistent with Gill's opinion that it was foreseeable that the plaintiff might sit on the arm of the chair. Id. He maintains that any objections about the facts on which Gill relied go to the weight of the testimony, not its admissibility. Id. at 20–21. The plaintiff asserts that Gill's assumed set of facts does not conflict with the evidence. Id. at 21.

The plaintiff argues that the defendant inaccurately characterizes Gill's explanation of her opinions as "unenumerated opinions." Id. He says that Gill did not criticize the defendant's website but mentioned the ASTM standards to establish that users might gain a false sense of security from a product stating that it complies with some voluntary safety standard. Id. at 22. He asserts that Gill is a member of ASTM International and so is qualified to opine about the standards. Id. The plaintiff argues that Gill referenced prior safety reports to demonstrate that the defendant should have tried to identify and correct the issues with the chair. Id. at 23–24. The plaintiff asserts that Gill identified in these chairs a "consistent description of failure over time" that should have put the defendant on notice of the product's problems. Id. at 24. The plaintiff argues that Gill is not opining that the root cause of the failures in each case is the same as it was here, but merely that the defendant should have performed an investigation into the possible issues with the chair because of these repeated reports. Id. at 25. Finally, the plaintiff adds that the warning sticker was not present on the chair when it collapsed, so Gill's reference to any

47

warning sticker simply is to show that it does not provide an effective warning because it can be removed. Id. at 26.

The defendant replies that the plaintiff must show that Gill's testimony is admissible by a preponderance of the evidence, and that the plaintiff has failed to do so. Dkt. No. 136 at 3–4. The defendant does not specifically respond to any of the plaintiff's arguments and reiterates its prior arguments that Gill is not qualified to testify about the chair's design and that Gill's opinions are not reliable. Id. at 4–8. The defendant appears to have abandoned its arguments that Gill made additional, unenumerated statements of opinion in her report, focusing only on the five enumerated opinions in its reply brief. See id.

B.    Analysis

Gill's report presents five opinions:

1. The subject chair was a hazard for the foreseeable population of users because as designed it would not accommodate the foreseeable population of users.

2. This hazard existed due to deficiencies in the Defendants' safety program; such deficiencies were another underlying cause of [the plaintiff's] incident and subsequent injuries.

3. The Defendant failed to implement the most effective mitigation strategy, Safety by Design, and instead relied on the least effective strategy, Warnings, to protect foreseeable users from a chair collapse.

4. The above failures on the part of [the defendant] were a substantial factor in causing the injuries to [the plaintiff].

5. [The plaintiff's] behavior was consistent with foreseeable human behavior as described in this report.

Dkt. No. 117-2 at 5–6.

The defendant challenges the first four opinions on the grounds that Gill is not qualified as a chair designer and cannot opine about the chair's design. The defendant bases this argument on Gill's deposition testimony that she is "not a chair designer." But the deposition questions the defendant cites asked Gill to opine outside the scope of her stated opinions. The defendant asked Gill what the defendant could have done to make the chair safer and what design options exist that would address the risks highlighted by Gill's report. Dkt. No. 118 at 6–7 (quoting Dkt. No. 117-1). The defendant asked this question despite the fact that Gill was not retained to provide an opinion on alternative designs for the chair. Gill's report states that she used human factors engineering to determine the "underlying root cause(s) of a personal injury incident consider[ing] the system as a whole including, the environment, the user, and the task/user behavior." Dkt. No. 117-2 at 5. Gill never opined about *how* the defendant could remedy the alleged hazards of the chair by changing the physical design of the chair. Gill *did* opine about possible warnings that the defendant could have used to reduce the risk inherent in the design, using her knowledge of human behavior. See id. at 9–12. But the presence or absence of a warning label has nothing to do with the physical design of the chair. Gill did not opine on chair design, so whether she is qualified to opine on chair design is irrelevant. Because the defendant provides no other basis for excluding these opinions, the court will deny the defendant's motion to exclude Gill's first four opinions.

The defendant argues that Gill's fifth opinion is unreliable because she did not consider any facts outside of the plaintiff's counsel's version of events, because she considered facts that contradict the plaintiff's testimony and because she did not consider the plaintiff's intoxication. The defendant seems to misunderstand Gill's opinion. Gill's opinion is that the plaintiff's decision to sit on the chair arm was foreseeable human behavior. Gill elaborated in her deposition that her "opinions are focused on were the actions that were engaged in by this person who was injured, were they consistent with foreseeable human behavior. And, in this case, somebody sitting on the arm of a chair to facilitate a conversation is—it was certainly foreseeable behavior." Dkt. No. 117-1 at 14, Tr. p. 71:18–24. The plaintiff's state of mind or motivations—that is, *why* he chose to sit on the chair arm—are not encompassed in Gill's opinion about whether the decision to sit on the arm of a chair is foreseeable human behavior. So the plaintiff's decision-making process and whether that decision-making process was impaired by his intoxication are not relevant to Gill's opinion that his actions were consistent with the foreseeable behavior of an outdoor chair user. At trial, the defendant will have the opportunity to cross-examine Gill about her conclusions, but the defendant has not established that her methodology was unreliable. The court will deny the defendant's motion to exclude Gill's opinions.

## VII. Conclusion

The court **GRANTS** the plaintiff's motion to exclude portions of Dr. Jones's opinions. Dkt. No. 109.

The court **GRANTS** the plaintiff's motion to strike Maureen Schneider's declaration. Dkt. No. 140. The court **ORDERS** that Schneider's declaration at Dkt. No. 134 is **STRICKEN** from the record.

The court **DENIES** the defendant's motion to exclude portions of Dr. Dunn's opinions. Dkt. No. 113.

The court **GRANTS** the defendant's motion to exclude Dr. Tribus's opinions. Dkt. No. 114.

The court **DENIES** the defendant's motion to exclude Joellen Gill's opinions. Dkt. No. 116.

Dated in Milwaukee, Wisconsin this 24th day of February, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**