UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

RONALD SCANLAN,

        Plaintiff/Cross-Defendant,

                                  Case No. 22-cv-586-pp

    v.

EMPLOYEE BENEFIT PROGRAM OF BANK OF MONTREAL/HARRIS,

        Involuntary Plaintiff/Cross-Claimant,

and BLUE CROSS BLUE SHIELD OF ILLINOIS,

        Involuntary Plaintiff,

    v.

ADAMS MANUFACTURING COMPANY,
ABC INSURANCE COMPANY
and DEF INSURANCE COMPANY,

        Defendants.

---

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT (DKT. NO. 110)**

---

On April 30, 2025, defendant Adams Manufacturing Company filed a motion for summary judgment. Dkt. No. 110. With the motion, the defendant filed motions to exclude opinions of three of the plaintiff's expert witnesses: Dr. Russell Dunn, Dr. Clifford Tribus and Joellen Gill. Dkt. Nos. 113, 114, 116. That same day, the plaintiff filed a motion to exclude opinions of the defendant's expert witness, Dr. David Jones. Dkt. No. 109. On February 24, 2026, the court granted the plaintiff's motion to exclude portions of Dr. Jones's opinions, granted the defendant's motion to exclude Dr. Tribus's opinions and

1

denied the defendant's motions to exclude Dr. Dunn's and Joellen Gill's opinions. Dkt. No. 157. With these threshold issues resolved, the defendant's motion for summary judgment is now ripe for decision.

## I.     Factual Background

The following facts are undisputed unless otherwise noted.

A.    Background Facts

The defendant manufactures injection-molded consumer products, including a line of plastic Adirondack chairs called the Real Comfort Adirondack chair ("RCA"). Dkt. No. 122 at ¶¶1–2. The defendant manufactures the RCA for individual residential use and, until 2020, also manufactured an RCA for commercial use. Id. at ¶¶3–4. The plaintiff alleges that he suffered an injury when an RCA broke while he was sitting on the chair's armrest at the same time another individual, Missy Gerber, was sitting in the chair's seat. Id. at ¶¶5, 14. The parties refer to this RCA as the "Subject Chair." Id. at ¶5. The Subject Chair was manufactured in April 2021 and is comprised of 85% polypropylene and 15% co-polymer. Id. at ¶¶6–7.

At sale, the RCA contains two warning labels: a stick-on label on the front of the chair and a molded-in warning on the underside of the chair. Id. at ¶8. The stick-on warning label contains the following list of warnings and instructions for proper use of the chair: "Caution: To avoid injury do not rock, tip or stand on chair. For use on hard, level surfaces only. Do not use on uneven, wet or slippery surfaces or for persons weighing over 250 lbs. Limited

warranty for 1 year against manufacturer's defect. For residential use only." <u>Id.</u> at ¶9. The following warning was molded into the Subject Chair:

> WARNING: NOT FOR PERSONS WEIGHING OVER 250 POUNDS (113 KILOGRAMS)
> DO NOT USE ON UNEVEN, WET, OR SLIPPERY SURFACES
> DO NOT ROCK, TIP, OR STAND ON CHAIR
> DO NOT LEAN BACK ON REAR LEGS
> DO NOT USE CHAIR IF IT SHOWS SIGNS OF WEAR AND/OR DAMAGE
> DO NOT USE IN A BUSINESS, INSTITUTION, OR COMMERCIALLY

<u>Id.</u> at ¶10. The plaintiff does not dispute the content of the warnings, but asserts that the stick-on warning label was no longer on the Subject Chair at the time of the accident and that the printed warning "appears on the underside of the chair beneath the seat where no one would see it and is difficult to read as it is the same color as the surrounding plastic." <u>Id.</u> at ¶¶9–10.

The RCA is tested to meet the "Class A" (Residential) mechanical performance standards established in ASTM F1838-19, the applicable safety standard for chairs intended for residential use. <u>Id.</u> at ¶11. The plaintiff and Missy Gerber weighed approximately 215 pounds and 105 pounds respectively at the time of the incident. <u>Id.</u> at ¶¶12–13. The defendant asserts that the plaintiff and Gerber's combined weight of 320 pounds exceeded the 250-pound limit stated on the warning stamped into the Subject Chair. <u>Id.</u> at ¶14. The plaintiff responds that he did not place his full weight on the arm of the chair, so it is "unlikely" that the chair was bearing weight that exceeded 250 pounds at the time of the incident. <u>Id.</u> at ¶14.

In addition to the RCA, the defendant manufactures other injection-molded plastic chairs, including the Big Easy Adirondack ("Big Easy"). Id. at ¶15. Under ASTM F1838-19, plastic chairs intended for non-residential use have a different testing standard than residential chairs. Id. at ¶16. The Big Easy is rated for commercial use and is tested to bear weight up to 350 pounds. Id. at ¶17.

B. The Incident on October 29, 2021

The plaintiff and several friends rented a guest house from Homestead Suites, Inc. for a group vacation on the weekend of October 29 through 31, 2021. Id. at ¶21. Homestead operates a hotel facility with rooms, luxury suites, and guest houses, including the Homestead Park House. Id. at ¶19. On or about June 7, 2021, Homestead purchased six RCA chairs, including the subject chair, and placed them around a fire pit at the Homestead Park House prior to the plaintiff's stay. Id. at ¶¶18, 20.

Starting at lunch on October 29, 2021, the plaintiff consumed alcohol and continued to do so throughout the day and night, drinking at least twelve or more beers over a twelve-hour period. Id. at ¶22. Around 11:00 p.m. that night, the plaintiff went outside to the patio of the Homestead Park House where he sat on the left armrest of the Subject Chair. Id. at ¶¶23–24. The plaintiff adds that he "had his left leg on the ground supporting most of his weight" while sitting on the arm of the chair. Id. at ¶24. Missy Gerber was already sitting in the seat of the Subject Chair at the time the plaintiff sat on the armrest. Id. at ¶25. The plaintiff was seated on the left armrest of the

4

Subject Chair for approximately ten to fifteen minutes before it broke. Id. at ¶26. The plaintiff testified at deposition that he does not remember anything about the Subject Chair immediately before it broke, other than that he was in the midst of a conversation "and then [he] was blacked out for a while until [he] came to consciousness at that point." Id. at ¶27 (quoting Dkt. No. 119-5 at 74:18–23). At his deposition, the plaintiff confirmed that he has no memory of the Subject Chair breaking, hearing anything associated with the Subject Chair breaking or the fall itself. Id. at ¶28. The plaintiff did recall being unable to move his hands or legs after the fall. Id. at ¶28. The plaintiff asserts that he was rendered a quadriplegic because of the incident. Dkt. No. 133 at ¶109.

The incident occurred shortly before midnight on October 29, 2021; the report prepared by paramedics with Door County Emergency Services states that the unit was notified of the incident at approximately 11:38 p.m. and arrived at Homestead Park House at 11:53 p.m. Dkt. No. 122 at ¶29. The plaintiff remained on the ground in the same physical position until paramedics arrived to evaluate him. Id. at ¶30.

The report prepared by the paramedics states that the plaintiff admitted to consuming at least a twelve-pack of beer and that he and the bystanders appeared visibly intoxicated. Id. at ¶31. Paramedics took the plaintiff to Door County Medical Center for additional treatment and testing, where laboratory work was performed at approximately 1:00 a.m. on October 30, 2021. Id. at

¶32. The hospital report[1] states that the plaintiff "had drank approximately 12 pack of beer throughout the evening" and that the plaintiff being "intoxicated" prevented him from responding to questions. Id. at ¶¶33–34. The Door County Medical Center records reflect that "Alcohol intoxication" was part of the clinical impression of the plaintiff. Id. at ¶35. The laboratory blood draw showed that Plaintiff had an alcohol concentration of 238 mg/dL, equivalent to a blood alcohol concentration of 0.238. Id. at ¶36.

C.     The Plaintiff's Intoxication

The defendant retained expert Laura J. Liddicoat, a forensic toxicology consultant, to analyze the results of the blood draw. Id. at ¶37. According to Liddicoat's expert report, the blood draw showed that between noon and 11:38 p.m. on October 29, 2021—the day of the incident—the plaintiff's body eliminated .195 to .234 g/dL of alcohol, equivalent to ten to twelve cans of beer. Id. at ¶44. The blood draw showed that the blood alcohol concentration remaining in the plaintiff's body at 1:00 a.m. on October 30, 2021 was equivalent to the combined alcohol in ten cans of light beer. Id. at ¶45. Liddicoat opined that alcohol is a central nervous system depressant that

---

[1] The plaintiff argues that the statements in the hospital report are "hearsay statements" that "are not corroborated by witness depositions or affidavits." Dkt. No. 122 at ¶¶33–35. But hospital reports typically are excluded from the hearsay rule under the business records exception. See Cook v. Hoppin, 783 F.2d 684, 689–90 (7th Cir. 1986) (citing Federal Rule of Evidence 803(6)). To the extent that the report contains statements by the plaintiff about his own intoxication, they either would not be hearsay because they are statements of a party opponent, Fed. R. Evid. 801(d)(2), or would fall under the exception of the hearsay rule that applies to a statement of the declarant's then-existing physical condition, Fed. R. Evid. 803(3).

6

affects mental, physical and psychomotor functions and negatively impacts cognitive skills including information processing, risk assessment, decision-making ability, self-evaluation and perception. Id. at ¶46–47. Liddicoat stated that alcohol can negatively impact physical skills including reducing muscle coordination, causing deterioration of reaction time, balance and vision. Id. at ¶48.

Liddicoat concluded that the plaintiff's alcohol concentration of .20 g/dL to .23 g/dL (equivalent to a blood alcohol concentration of .20% to .23%) at the time of the incident "would have a strong detrimental impact on his judgment, vision, alertness, memory, reaction time, muscle coordination, balance and ability to react to emergency situations." Id. at ¶52 (quoting Dkt. No. 112-5 at 4). The plaintiff does not dispute any of Liddicoat's conclusions but argues that Liddicoat's report "includes no opinion that [the plaintiff] would have been unable to sense that his chair arm was flexing over a period of 5-10 minutes even with delayed reaction time." Id. at ¶52.

The plaintiff did not retain an expert to opine about his intoxication at the time of the incident and did not depose Liddicoat regarding her opinions. Id. at ¶¶39–41. The plaintiff obtained statements from lay witnesses who were present during the incident about the perceived effect the plaintiff's alcohol consumption had on his behavior. Id. at ¶¶56–58. Each lay witness responded that they did not believe the plaintiff's behavior that night was influenced by his alcohol consumption. Id. at ¶59. The parties dispute whether these witnesses were intoxicated at the time of the incident. Id. at ¶61.

7

D.    Joint Testing of the Subject Chair

The parties jointly collected test data on the makeup of the Subject Chair. Id. at ¶62. The jointly collected data included skiving (cutting off thin chair shavings) the outermost layer of the Subject Chair's surface in five locations. Id. at ¶63. The skives—each approximately 0.3 millimeters thick—were tested and analyzed by the plaintiff's expert Dr. Russell Dunn and the defendant's expert Dr. Marc Zupan to determine whether the chair had undergone any oxidative degradation. Id. at ¶¶64–65.

The first test, referred to as Differential Scanning Calorimetry ("DSC"), showed that the material composition and processing of the Subject Chair were within normal parameters. Id. at ¶66. The DSC data showed that there were no material defects or processing irregularities. Id. at ¶67. According to Dr. Dunn, the "DSC testing is consistent with the melting point" of the polypropylene as reported by the resin manufacturer. Id. at ¶68 (quoting Dkt. No. 112-23 at 37). The second test, referred to as Fourier Transform Infrared Spectroscopy ("FTIR"), compared the chemistry of the outside, exposed portion of the skives from the Subject Chair to their inner, non-exposed portion. Id. at ¶69. The FTIR results show that "there is no oxidation in the core or bulk of the material" from the Subject Chair; instead, "the oxidation of the subject chair material is limited to the outer most surface." Id. at ¶70 (quoting Dkt. No. 112-27 at 28).

The parties and their experts dispute how oxidative degradation may have affected the structural integrity of the chair. Id. at ¶71. Dr. Dunn found

8

that the "level of oxidation was severe" and compromised the chair's "mechanical strength." Id. at ¶71 (quoting Dkt. No. 119-4 at 38, 120). Dr. Dunn concluded that the oxidative degradation made the chair brittle so that it would snap rather than bend when force was applied. Id. at ¶71 (quoting Dkt. No. 119-4 at 47–48). By contrast, Dr. Zupan concluded that the oxidative degradation was a "surface-specific phenomenon, leaving the internal structure of the chair material unaltered from its original state." Id. at ¶72 (quoting Dkt. No. 112-27 at 29). Dr. Zupan asserted that "[n]othing in the available test data indicates any material manufacturing defect or material property anomaly in the subject chair." Id. at ¶73 (quoting Dkt. No. 112-27 at 4).

E.      Dr. Dunn's Assessment and Alternative Designs

Dr. Dunn determined that the "root cause of failure" of the Subject Chair was "brittle fracture due to reduced mechanical strength of the chair as a result of the oxidative degradation of the [polypropylene] polymer resin that was selected by [the defendant] or the manufacture of the subject chair." Id. at ¶77 (quoting Dkt. No. 112-23 at 39). Dr. Dunn stated that "the depth [of oxidative degradation] increases as it oxidizes more over time, so very little oxidation has very little effect on the mechanical strength, more oxidation affects it more." Id. at ¶100 (quoting Dkt. No. 112-25 at 47:10-49:2). According to Dr. Dunn, more severe oxidation penetrates the material at deeper levels, which causes greater embrittlement. Id. at ¶100. Dr. Dunn reported that all forms of polypropylene—the material that makes up ninety percent of the Subject Chair—are susceptible to oxidative degradation, though this effect may

9

be mitigated by using antioxidants in the polypropylene or switching to a different polymer, such as nylon. Id. at ¶¶79–82. Dr. Dunn also proposed that a thicker, heavier chair such as the Big Easy chair could mitigate the effects of oxidative degradation. Id. at ¶¶83–85.

Dr. Dunn opines in his supplemental report that "[d]uctile flexure (bending) of the arm, under load, of a Real Comfort® Adirondack chair that has not undergone oxidative degradation would serve as a pre-warning of the inability of an arm to support weight prior to ductile fracture of the arm." Id. at ¶87 (quoting Dkt. No. 112-24 at 5). The plaintiff asserts that because the Subject Chair had undergone oxidative degradation, it was brittle and would not flex under pressure. Id. at ¶91. But Dr. Dunn did not test the flexure or bending of the Subject Chair itself, nor did he believe it was possible to determine whether the Subject Chair's arm flexed because it already had fractured. Id. at ¶91. Dr. Dunn tested some exemplar RCA chairs that also showed signs of exterior oxidative degradation like the Subject Chair and found that those chairs' arms had "some pretty significant flex" or bending, but Dr. Dunn stated that the exemplar chairs were not as severely degraded at the Subject Chair. Id. at ¶93. Dr. Dunn testified that if the arm of the Subject Chair had bent under the plaintiff's weight the way the exemplar RCA chairs bent, the plaintiff would have noticed the bending and known to get off the chair prior to its breaking. Id. at ¶94.

Dr. Dunn opined that "[t]he subject chair is defective and unreasonably dangerous for this application and alternative safer designs (thicker walls

and/or the addition of calcium carbonate) were available for use." Id. at ¶95 (quoting Dkt. No. 112-24 at 5). According to Dr. Dunn, "[a]ddition of 5% or 10% calcium (calcium carbonate) filler to the resin used to make the residential RealComfort® Adirondack chair increases impact strength of the chair" and "increases flexural modulus and flexural strength of the chair." Id. at ¶¶96–97. But Dr. Dunn agreed that the addition of calcium carbonate would also make the Subject Chair less flexible, albeit stronger. Id. at ¶98.

F.    Plaintiff's Expert Joellen Gill's Report

The plaintiff also retained Joellen Gill, a human factors engineer and an expert in safety and risk management, as an expert. Id. at ¶101. Gill opined that the Subject Chair was a hazard to foreseeable users because "the Defendant failed to implement the most effective [risk] mitigation strategy, Safety by Design, and instead relied on the least effective strategy, Warnings, to protect foreseeable users from a chair collapse." Dkt. No. 133 at ¶¶145, 147 (quoting Dkt. No. 119-19 at 4–5). Gill stated that a reasonable warning must clearly convey the nature of the hazard, the potential consequences and the actions necessary to control the hazard and its consequences. Id. at ¶153.

According to Gill, "a removable sticker negates any effectiveness of a warning once it is removed." Dkt. No. 122 at ¶102 (quoting Dkt. No. 112-26 at 10). The plaintiff asserts that the warning sticker was not on the chair at the time of the accident and therefore could not operate to warn him. Id. at ¶102. Gill opined that "[a]n obscure warning located underneath the chair is not likely to be detected, even if the chair is turned over" and that "a warning

11

underneath the chair will certainly not capture your attention." Id. at ¶103 (quoting Dkt. No. 112-26 at 10). The plaintiff testified at his deposition that he did not look for a warning label regarding the chair's weight limit and stated that, because it was dark at the time of the incident, he likely wouldn't have noticed a warning label on the chair "unless it was displayed with some type of coloring that would bring your attention to it." Id. at ¶104 (quoting Dkt. No. 112-9 at 72:6–18).

Gill asserted that the defendant's reliance on warnings was "a substantial factor in causing the injuries to [the plaintiff]" and that the plaintiff's behavior was consistent with foreseeable human behavior. Dkt. No. 133 at ¶¶148–49 (quoting Dkt. No. 119-19 at 4–5). Gill explained the concept of "expectancy;" that is, when people have a predisposition to believe that a certain set of conditions will exist. Id. at ¶150. Gill found that it was foreseeable that a person might sit on the arm of the chair and opined that if the plaintiff had sat on the arm of a chair without an adverse result, he would expect that he could perform the same action with a similar outcome in the future. Id. at ¶¶150, 152. Gill stated that because the plaintiff was familiar with chairs, he would not seek out a warning as to how to use the chair and that it was foreseeable that, if he sat on the flat arm of the chair, he would expect that it would continue to hold his weight. Id. at ¶151.

## II. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

judgment as a matter of law." Federal Rule of Civil Procedure 56(a). "Material facts" are those that, under the applicable substantive law, "might affect the outcome of the suit." See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute over a material fact is "genuine" "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A moving party "is 'entitled to a judgment as a matter of law'" when "the nonmoving party has failed to make a sufficient showing on an essential element of [its] case with respect to which [it] has the burden of proof." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Still,

> a party seeking summary judgment always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.

Id. (internal quotation marks omitted).

To determine whether a genuine issue of material fact exists, the court must review the record, construing all facts in the light most favorable to the nonmoving party and drawing all reasonable inferences in that party's favor. See Heft v. Moore, 351 F.3d 278, 282 (7th Cir. 2003) (citing Liberty Lobby, 477 U.S. at 255). "However, [the court's] favor toward the nonmoving party does not extend to drawing inferences that are supported by only speculation or conjecture." Fitzgerald v. Santoro, 707 F.3d 725, 730 (7th Cir. 2013) (quoting Harper v. C.R. Eng., Inc., 687 F.3d 297, 306 (7th Cir. 2012)). That is, "to survive summary judgment, the non-moving party must establish some genuine issue for trial 'such that a reasonable jury could return a verdict' in

13

her favor." <u>Fitzgerald</u>, 707 F.3d at 730 (quoting <u>Makowski v. SmithAmundsen LLC</u>, 662 F.3d 818, 822 (7th Cir. 2011)).

### III.   Defendant's Motion for Summary Judgment (Dkt. No. 110)

The defendant has moved for summary judgment on all claims, arguing that the plaintiff has failed to establish that the Subject Chair was defectively manufactured, defectively designed or contained inadequate warnings or that the collapse of the chair caused his injuries. Dkt. No. 110 at 7. Further, the defendant asserts that the plaintiff was intoxicated at the time of the accident, establishing a statutory defense to the plaintiff's strict liability claim under Wis. Stat. §895.047. <u>Id.</u>

### A.   <u>Strict Product Liability</u>

The amended complaint asserts a strict product liability claim under Wis. Stat. §895.047, arguing that the Subject Chair was defective "for one more of the following reasons: (a) It contained a manufacturing defect; (b) It was defective in design; (c) It was defective because of inadequate instructions or warnings." Dkt. No. 23-1 at ¶17. Under Wis. Stat. §895.047, the plaintiff must show

> (a) That the product is defective because it contains a manufacturing defect, is defective in design, or is defective because of inadequate instructions or warnings. . . .
> (b) That the defective condition rendered the product unreasonably dangerous to persons or property.
> (c) That the defective condition existed at the time the product left the control of the manufacturer.
> (d) That the product reached the user or consumer without substantial change in the condition in which it was sold.
> (e) That the defective condition was a cause of the claimant's damages.

14

Wis. Stat. §895.047(1); see also Murphy v. Columbus McKinnon Corp., 405
Wis. 2d 157 (Wis. 2022) (interpreting statute). The defendant argues that the
plaintiff has failed to establish that the Subject Chair had any defects and that
Wisconsin's intoxication defense precludes the plaintiff's claims. Dkt. No. 110
at 18.

        1.    *Manufacturing Defect*

      The defendant argues that the plaintiff has failed to establish a
manufacturing defect claim because there is no evidence that the Subject Chair
departed from its intended design. Dkt. No. 110 at 18. The defendant asserts
that its materials' expert, Dr. Zupan, confirmed there is "[n]othing in the
available test data indicat[ing] any material manufacturing defect or material
property anomaly in the subject chair." Id. at 19 (quoting Dkt. No. 111 at ¶73).
The plaintiff did not respond to this argument. The defendant asserts that the
plaintiff's failure to respond means that he has waived the claim. Dkt. No. 132
at 2.

      Under Wisconsin law, "a product contains a manufacturing defect if the
product departs from its intended design even though all possible care was
exercised in the manufacture of the product." Wis. Stat. §895.047(1)(a). Dr.
Zupan determined that the Subject Chair did not depart from its intended
design and the plaintiff does not dispute that conclusion. See Dkt. No. 122 at
¶73. Because the undisputed facts show that the chair did not depart from its
intended design, it was free of manufacturing defects and the court must grant

summary judgment for the defendant on the plaintiff's manufacturing defect claim.

### 2. *Design Defect*

The defendant argues that the plaintiff cannot establish that the use of polypropylene to manufacture the Subject Chair is a design defect. Dkt. No. 110 at 19. It asserts that Wisconsin law precludes design defect claims if the damage was caused by an inherent characteristic of the product. Id. The defendant says that polypropylene is the main material and thus an inherent characteristic of the Subject Chair. Id. at 20. Dr. Dunn opined that oxidative degradation caused the chair's collapse and that using a different polymer (nylon instead of polypropylene) to construct the chair would eliminate the risk of oxidative degradation. Id. at 20 (quoting Dkt. No. 111 at ¶81). The defendant argues that Dr. Dunn concluded that the damage was caused by an inherent characteristic of the product (polypropylene). Id. It asserts that any proposed alternative design that changes the Subject Chair's polymer cannot form the basis of a design defect claim. Id.

The defendant argues that beyond material selection, there is no evidence supporting a reasonable alternative design. Id. at 21. According to the defendant, Dr. Dunn presents three alternative designs: (1) the Big Easy chair, (2) increased mold thickness and (3) including calcium in the Subject Chair. Id. The defendant argues that the Big Easy chair is not a reasonable alternative design for the Subject Chair because it is a completely different product held to different testing standards. Id. The defendant argues that Dr. Dunn's second

16

alternative design using thicker molds is similarly based on a different product—the commercial RCA chair—and so is not a suitable alternative design for the Subject Chair, which is rated for residential use. Id. at 22–23.

The defendant asserts that there is no evidence that the Subject Chair is not reasonably safe as designed. Id. at 23. The defendant argues that even if it added calcium carbonate to the polypropylene used in the Subject Chair, Dr. Dunn concedes that the chair still would experience oxidative degradation. Id. The defendant argues that while the alternative designs may slightly improve the Subject Chair, Dr. Dunn's opinion does not establish that the Subject Chair is not reasonably safe as is. Id. at 23–24.

The defendant next argues that the plaintiff cannot establish that any alleged defect caused his injury. Id. at 24. The defendant argues that Dr. Dunn identifies oxidative degradation as the root cause of the chair's failure, but concedes that "all plastic chairs made of polypropylene will eventually experience oxidative degradation and embrittlement," essentially rendering all such chairs defective. Id. at 25. The defendant maintains that its own expert, Dr. Zupan, concluded that there was no oxidation in the bulk of the chair's material and that the oxidative degradation was localized to the surface of the chair. Id. at 25–26. The defendant asserts that the plaintiff has not shown that an alternative design would have prevented the incident because including additives in the polypropylene would merely slow the degradation, not eliminate it entirely. Id. at 26.

The plaintiff responds that the defendant mischaracterizes Dr. Dunn's opinion by ignoring his primary alternative design proposal: antioxidant additives. Dkt. No. 121 at 5. The plaintiff argues that because polypropylene is susceptible to oxidative degradation, the defendant should have known to incorporate antioxidant additives into the polymer. Id. He asserts that Dr. Dunn's opinion states that either adding antioxidants to the polypropylene or selecting a different polymer would adequately mitigate oxidative degradation for the chair's lifecycle. Id. at 6. The plaintiff characterizes the proposal for a thicker, more robust chair as a secondary proposal to antioxidants. Id.

The plaintiff argues that the "inherent characteristic" doctrine the defendant cites no longer is good law. Id. at 7. According to the plaintiff, the statute now requires that the danger of the inherent characteristic must be recognizable by the ordinary consumer. Id. at 8. The plaintiff argues that the average consumer would not know what polypropylene is and would not be aware of the risks of oxidative degradation. Id. The plaintiff contends that even applying the older version of the doctrine, the inherent characteristic must be something that "cannot be designed out of the product." Id. at 9 (quoting Godoy ex rel. Gramling v. E.I. du Pont de Nemours & Co., 319 Wis. 2d 91, 118 (Wis. 2009)). The plaintiff argues that the polypropylene is not an inherent characteristic of the Subject Chair because Adirondack chairs can be made of many materials, not just polypropylene. Id. at 10. Further, the plaintiff argues that the defendant could continue safely making chairs out of polypropylene if it added antioxidants to the polypropylene, which would retain the

18

polypropylene characteristic of the chair. Id. at 10–11. The plaintiff asserts that other products on the market can serve as reasonable design alternatives without transforming the subject product into something altogether different. Id. at 11–12.

The plaintiff next contends that there is "no question" that the Subject Chair is unreasonably dangerous in its current form. Id. at 12. He argues that an outdoor chair that severely degrades within a few months of use and "can spontaneously, catastrophically rupture during foreseeable use" is not reasonably safe. Id. at 12–13. The plaintiff asserts that the chair has a one-year warranty, yet within months of manufacture broke due to oxidative degradation. Id. at 13. He asserts that based on these facts, a reasonable jury could find that the chair is unreasonably dangerous due to the defendant's choice of materials. Id.

The plaintiff also argues that the question of whether the defect caused his injury is a fact-specific inquiry best left to the jury. Id. at 13–14. The plaintiff says that he suffered severe injuries because the chair shattered. Id. He argues that Dr. Dunn concluded that the chair shattered due to oxidative degradation, and that the chair swiftly oxidized because it was made of polypropylene. Id. at 14–15. He asserts that this is enough evidence for a jury to conclude that the chair's design caused his injury. Id. at 15.

The defendant replies that the Subject Chair *did* contain antioxidants, but it relies on the declaration of Maureen Schneider to support this argument. Dkt. No. 132 at 2–3. The court struck Schneider's declaration from the record,

and so it will not consider these arguments. See Dkt. No. 157 at 29. The defendant also argues that Dr. Dunn did not clearly propose antioxidant additives as an alternative design in his report or deposition. Dkt. No. 132 at 3–4. The court also rejected this argument in its order denying the defendant's motion to strike Dr. Dunn's opinions. See Dkt. No. 157 at 35. The defendant's only other reply argument that responds to the antioxidant additive proposal asserts that polypropylene still will degrade over time even if antioxidants are present, so the antioxidant additive proposal is not a suitable alternative design proposal. Id. at 9.

To establish his strict product liability claim under a design defect theory, the plaintiff first must demonstrate that the Subject Chair was defectively designed. Gilbert v. Lands' End, Inc., 158 F.4th 839, 845 (7th Cir. 2025) (citing Godoy, 319 Wis. 2d at ¶29). A plaintiff can establish a design defect "if the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the manufacturer and the omission of the alternative design renders the product not reasonably safe." Wis. Stat. §895.047(1)(a).

The plaintiff argues that oxidative degradation is a foreseeable risk that could have been reduced or avoided had the defendant included antioxidant additives in the polypropylene polymer used to manufacture the chair. The defendant argues that the plaintiff's claim is precluded because polypropylene is an "inherent characteristic" of the Subject Chair. The defendant's argument fails for multiple reasons. First, the statute states that "[t]he court shall

20

dismiss the claimant's action under this section if the damage was caused by an inherent characteristic of the product *that would be recognized by an ordinary person with ordinary knowledge common to the community that uses or consumes the product.*" Wis. Stat. §895.047(3)(d) (emphasis added). Oxidative degradation is not a characteristic that "an ordinary person with ordinary knowledge" would expect an outdoor chair to have. The average consumer likely would assume that an outdoor chair is designed to stand up to the elements. Second, polypropylene is not an inherent characteristic of an outdoor Adirondack chair. Dr. Dunn opined that outdoor chairs can be made of multiple different materials, such as nylon. Making the Subject Chair out of a different polymer—or simply adding antioxidants to the same polymer—would not make the Subject Chair unrecognizable or a completely different product.

Turning to the alleged design defect, the parties' experts come to different conclusions about whether there was a defect present in the chair's design. Dr. Dunn opined that the Subject Chair "fractured due to oxidative degradation and reduction in mechanical strength of the [polypropylene] polymer," that alternative, safer designs were available for use and that the failure due to oxidative degradation was foreseeable and avoidable. Dkt. No. 112-23 at 39–40. By contrast, Dr. Zupan opined that polypropylene was a suitable material for the Subject Chair, that the oxidative degradation "was limited to the outermost surface of the chair" and that the Subject Chair's failure was due to the excess weight placed on it. Dkt. No. 112-27 at 4–5.

21

Both experts present enough facts for a reasonable jury to conclude that the chair was or was not defectively designed. Summary judgment is not appropriate when resolution of a claim requires the court to choose between opposing expert testimony. See Wipf v. Kowalski, 519 F.3d 380, 385 (7th Cir. 2008) (explaining that "in a case of dueling experts . . . it is left to the trier of fact . . . to decide how to weigh the competing expert testimony"). Because a reasonable jury could find that the Subject Chair was defectively designed, the court must deny the defendant's motion for summary judgment on the design defect claim.

3.    *Warning Defect*

The defendant argues that there is no evidence that the Subject Chair was defective because of inadequate instructions or warnings. Dkt. No. 110 at 26. The Subject Chair purportedly had two warnings: a warning label sticker and a warning molded into the bottom of the chair. Id. The defendant argues that the plaintiff's experts have not opined that these warnings were substantively inadequate. Id. at 27. It says that the plaintiff admitted that he did not look for a warning before sitting on the chair. Id. The defendant argues that the Subject Chair contains warnings against commercial use and that the removal of the warning sticker was outside of the defendant's control, as was Homestead's decision to use residential chairs in a commercial setting. Id. at 27–28. The defendant asserts that the plaintiff has failed to present any reasonable instructions or warnings that could have reduced the foreseeable risks of harm from using the chair. Id. at 28. The defendant maintains that the

22

plaintiff has failed to establish that the inadequate warning caused his injuries because he concedes that he did not look for a warning. Id.

The plaintiff responds that the warning is printed on the underside of the Subject Chair and is difficult to read, so it does not properly warn the user of the danger of the chair breaking. Dkt. No. 121 at 15–16. He argues that both Dr. Dunn and Gill opined that the Subject Chair's warnings were inadequate. Id. at 16. The plaintiff asserts that Gill need not explicitly say that the warning was inadequate, and that her testimony that the warning was ineffective is sufficient to establish that the warning was unreasonable. Id. at 17. The plaintiff argues that Gill opined that people are unlikely to read warnings unless they are designed to attract attention. Id. He asserts that the warning's location on the bottom of the chair means that a user is unlikely to notice it prior to sitting on the chair. Id. He also argues that the defendant should have anticipated that the warning sticker might be removed. Id. at 17–18. The plaintiff contends that it is foreseeable that people will sit on the chair whether it is placed in a residential or a commercial setting. Id. at 18. He argues that the defendant should have placed a permanent warning in a more visible location because users would be unlikely to turn over the chair to look for a warning. Id. The plaintiff also asserts that he would have read a warning that was easily visible. Id. at 18–19.

The defendant replies that even if Gill opined that the warning was inadequate, she does not opine that the foreseeable risks of harm posed by the Subject Chair would have been reduced or avoided by a different warning or

23

that the omission of a warning renders the chair "not reasonably safe." Dkt. No. 132 at 11. It argues that the plaintiff has failed to provide examples of reasonable instructions or warnings and asserts that failing to do so is fatal to his claim. Id. (citing Moore v. Nat'l Presto Indus., Inc., 603 F. Supp. 3d 676, 682–83 (W.D. Wis. 2022)).

To establish a warning defect claim, the plaintiff first must show that the Subject Chair is "defective because of inadequate instructions or warnings." Wis. Stat. §895.047(1)(a). "A product is defective because of inadequate instructions or warnings only if the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the manufacturer and the omission of the instructions or warnings renders the product not reasonably safe." Id.

The plaintiff has not established that the foreseeable risks of harm posed by the Subject Chair could have been reduced or avoided by providing reasonable instructions or warnings. Gill opined that an effective warning "must attract the user's attention, motivate the user to read and process the information, and have sufficient credibility," but she conceded that "[e]ven if a warning is noticed, that does not mean that the user is likely to read it, much less read all of its contents, particularly if it is unduly burdensome to do so." Dkt. No. 112-26 at 9. According to Gill, "[i]f the consumer believes they know how to use a given product or if they perceive the product is relatively easy to use and that they have sufficient skills/knowledge to use it safely, they are unlikely to read warnings." Id. at 9–10. Gill's report stated that "[i]f the warning

24

conflicts with previous experience or the examples set by others, it may not be believed." Id. at 10. Gill opined that "had [the plaintiff] had occasion to sit on the arm of a chair with benign experience, he would have an expectancy that he could perform the same action again with similar experience" and that "[i]t is unlikely he would have been in an information seeking mode" when he sat on the chair. Id. at 12. To use the plaintiff's words, "because he was familiar with chairs, he would not seek out a warning as to how to use the chair and it was foreseeable that, if he sat on the flat arm of the chair, he would expect that it would continue to hold his weight." Dkt. No. 122 at ¶151.

Gill explained that a consumer would be unlikely to look for a warning on a familiar product like a chair, and the plaintiff concedes that he would not have sought out a warning because he was familiar with chairs. Gill even asserted that if a warning conflicts with the user's prior experience, the user might disregard the warning. The plaintiff has not provided any examples of alternative warnings that would have prevented the harm. Based on these undisputed facts, the plaintiff cannot establish that *any* warning would have prevented his injury simply because he was unlikely to read or credit a warning even if it was clearly visible. See Moore, 603 F. Supp. 3d at 682–83 (summary judgment on warning defect claim was proper where plaintiff's expert failed to identify how an alternative warning could have prevented the injury); Rivers v. B Braun Interventional Sys. Inc., Case No. 19-CV-988, 2023 WL 7166520, at *25 (E.D. Wis. Oct. 31, 2023) (granting summary judgment for defendant where plaintiff failed to establish that additional warnings would have changed the

25

user's behavior). The court will grant summary judgment for the defendant on the plaintiff's warning defect claim.

4. *Intoxication Defense*

Both parties spend significant time discussing the plaintiff's intoxication during the incident. The defendant asserts that it is entitled to summary judgment because Wisconsin law provides a defense based on the plaintiff's intoxication. Dkt. No. 110 at 29–30. The plaintiff responds that while he may have been intoxicated, it was not the cause of his injury. Dkt. No. 121 at 24. Causation is the final element a plaintiff must prove to establish a strict product liability claim. Wis. Stat. §895.047(1)(e). Because the court has determined that there is a genuine dispute of material fact as to the first element of the plaintiff's product liability claim, addressing causation is premature. The court will touch briefly on this defense to clarify that it is not a complete defense to the plaintiff's claims, but a rebuttable evidentiary presumption.

If the defendant shows "by clear and convincing evidence" that the plaintiff had a blood alcohol content of 0.08% or more at the time of the accident, "there shall be a rebuttable presumption that the claimant's intoxication . . . was the cause of his or her injury." Wis. Stat. §895.047(3)(a). Although the court was unable to locate case law interpreting this provision of the statute, Wisconsin's civil jury instructions provide some guidance:

> The words "the cause" mean that neither the product nor the conduct of any other party was a substantial factor in producing the plaintiff's injury and that the plaintiff's alcohol concentration of .08 or more was the single, exclusive cause of his injury. However, there

26

is evidence that you may believe that the plaintiff's injury had more than one cause. You must resolve this conflict. **Unless you are satisfied by the greater weight of the credible evidence, to a reasonable certainty, that it is more probable than not that there was an additional cause which produced the plaintiff's injury, you must find that having an alcohol concentration of .08 or more was the cause of the plaintiff's injury**.

Wis. JI-Civil 3260.1 Product Liability: Wis. Stat. §895.047 (emphasis added). The "intoxication defense" is thus not a complete defense to liability, but rather an evidentiary presumption that the plaintiff can rebut with proof of an additional cause of the injury.

It is undisputed that the plaintiff's blood alcohol content exceeded 0.08% at the time of the incident. Dkt. No. 122 at ¶36. That means that the defendant has established the rebuttable presumption that the plaintiff's intoxication was the cause of his injury. But that does not automatically defeat the plaintiff's claim. The plaintiff may rebut the presumption by showing "that it is more probable than not that there was an additional cause which produced the plaintiff's injury." Id. This is a fact-specific inquiry that the court cannot resolve at the summary judgment stage. See Murphy, 405 Wis. 2d at 190 (summary judgment inappropriate where parties disputed whether the design defect or the plaintiff's conduct were the cause of the plaintiff's injury). At trial, the plaintiff will have the opportunity to present evidence rebutting the presumption.

B.   Negligence

The amended complaint also asserts a negligence claim. Dkt. No. 23-1 at ¶¶13–15. Wisconsin's product liability statute does not preclude the plaintiff

27

from bringing a common law negligence claim. Wis. Stat. §895.047(6). To establish a negligence claim under Wisconsin law, the plaintiff must show that the defendant "owed him a duty, that [the Subject Chair's] design did not meet the standard of care that duty required, and therefore [the defendant] breached its duty, which caused his injuries." Murphy, 405 Wis. 2d at 190 (citing Collins v. Eli Lilly Co., 116 Wis. 2d 166, 181–82 (Wis. 1984)).

The defendant argues that the plaintiff has failed to establish that it breached any duty it owed to the plaintiff or that the alleged breach caused the plaintiff's injuries. Dkt. No. 110 at 35–36. The defendant asserts that there is no defect present in the Subject Chair, so it has not breached any duty to the plaintiff. Id. at 36. But as the court discussed above, there are disputed material facts about the existence of a defect in the Subject Chair's design. The court cannot grant summary judgment for the defendant on the plaintiff's negligence claim. The assessment of whether the design of the subject chair met the standard of care required will fall to the jury. Similarly, the court will rule on whether the alleged defect caused the plaintiff's injury. The court will deny the defendant's motion for summary judgment on the negligence claim.

## IV.   Conclusion

The court **GRANTS IN PART AND DENIES IN PART** the defendant's motion for summary judgment. Dkt. No. 110.

The court **GRANTS** the motion as to the plaintiff's manufacturing defect and warning defect claims and **ORDERS** that those claims are **DISMISSED WITH PREJUDICE**.

The court **DENIES** the motion as to the plaintiff's design defect and negligence claims.

The court **ORDERS** that the parties must appear for a telephonic status conference on **April 20, 2026 at 3:30 PM (Central Time)** to discuss next steps. The parties are to appear by calling the court's conference line at 551-285-1373 and entering Meeting ID 161 4901 8989 and Passcode: 190021 when prompted.

Dated in Milwaukee, Wisconsin this 6th day of March, 2026.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**